STATE of Minnesota, Respondent,

v.

Robert Edward THIEMAN, Appellant.

Nos. CX–88–1027, C0–88–1764.

Supreme Court of Minnesota.

April 28, 1989.

C. Paul Jones, Scott Swanson, Minneapolis, for appellant.

Hubert H. Humphrey, III, Paul R. Kempainen, State Atty. Gen., St. Paul, and John Carlson, Pine Co. Atty., Pine City, for respondent.

YETKA, Justice.

A Pine County jury found defendant, Robert Edward Thieman, guilty of first-degree murder in the death of Shirley Sahf, attempted second-degree murder and assault of Pine County Deputy Sheriff Brett Grinde, intentional assault of Pine County Deputy Sheriff Douglas Spindler with a dangerous weapon (gasoline) and first-degree arson. The trial court sentenced defendant to life imprisonment for the first-degree murder conviction, a consecutive 108–month sentence for the attempted murder, a concurrent 36–month sentence for second-degree assault and a concurrent 41–month sentence for the arson conviction. We affirm the convictions, but reduce the consecutive sentence for attempted second-degree murder to 60 months.

## I.

Prior to her death, Shirley Sahf had known defendant for 18 years. For the last 16 years, the two lived together in rural Pine County. By the middle of 1987, the relationship between Sahf and defendant was clearly deteriorating. At that time, Shirley Sahf told her son Mark that she was going to ask defendant to move out of her home. She also told her manager at the Legion Club, Ricky Carl, that her relationship with defendant was over. Indeed, 2½ weeks before the murder, defendant left Sahf's home and, since then, had been staying in his motorhome.

The same evening that Sahf told Ricky Carl that she was going to leave defendant, Carl mentioned it to defendant. Defendant did not seem surprised to learn of Sahf's intentions, but responded, "We better not [break up] or I'll kill her." When Carl suggested that defendant wasn't serious, he became depressed and either said, "Well, she isn't going anywhere without me." or "I'm not going anywhere without her." Sahf feared going home that night after she discovered that Carl discussed the break-up with defendant.

There is extensive testimony from Sahf's friends about her fear of defendant and her concern that he might commit suicide. On different occasions, he had given Sahf and others the impression that he might kill himself.

Sometime after Sahf finished work and left the Legion Club on July 13, she was shot and killed by defendant. Defendant alleges that the gunshot was accidental (or, at the most, designed to frighten Sahf) and that she died sometime around 9:30 a.m. the morning of July 14. Conversely, the state's theory of the case is that defendant, with premeditation, killed Sahf sometime after she returned home on July 13 and then planned to leave town. Supporting the state's theory, there was testimony that, the next day, defendant arranged to store some belongings at a friend's house and repaid an old loan from his father. He also told two friends that morning that Sahf had pulled a gun on him.

Defendant called his friend, Stanley Holt, from the Sahf farm at approximately 9:30 a.m. on July 14. During the conversation, Holt developed the belief that defendant was going to kill himself and sent his fiancee to summon the police. Deputy Sheriffs Brett Grinde and Douglas Spindler responded to the call and arrived at Sahf's home where they were met outside by defendant, who told them that Sahf had left with a friend about five minutes ago. Grinde followed defendant inside, saw him reach for a gun, and struggled to take it away from him. Defendant then threw a glass of liquid (alcohol or gasoline) on Grinde and lit a cigarette lighter in his direction threatening, "I'm taking you with me." or "You're coming with me."

Spindler, responding to a call from Grinde, entered the house and saw defendant kneeling in a pool of fire. Instead of attempting to escape the fire, defendant threw a bucket of liquid towards Grinde, which ignited and engulfed Grinde in flames. The officers ran from the house and Spindler was able to extinguish Grinde's burning clothing, but, because of the fire, he was unable to re-enter the house to rescue defendant. While Spindler and Grinde waited for help to arrive, they heard a gunshot and later heard ammunition exploding.

When the house fire was finally extinguished, a badly burned body was discovered in the living room. Prior to an internal examination at the scene by the deputy medical examiner, the body was presumed to be that of defendant. It soon became apparent, however, that the body was female and a search for defendant ensued. He was found less than 6 hours later lying in tall grass about one-fifth of a mile from the farm. It was later determined that he had escaped through a woodbox in the back of the house. The body in the house was identified as Sahf's, and the cause of death was determined to be a gunshot to the neck.

Defendant was brought to the hospital for treatment of burns on his hand and forearm. At the hospital, Lt. Robert Johnson advised defendant of his *Miranda*

rights. When he asked if defendant wished to speak with him, defendant shook his head negatively. The next morning, defendant was taken to the Pine County Detention Center and again advised of his *Miranda* rights. Defendant gave two statements to the police in which he explained that he shot at Sahf to scare her. He also stated that, when Grinde and Spindler arrived the previous morning, he had gone into the house to shoot himself and wanted to start a fire so that he and Sahf would be incinerated together.

At trial, in addition to physical evidence and defendant's taped statements to Lt. Johnson, the state presented the testimony of Quentin Swadinsky, defendant's cellmate at the Pine County Jail. Swadinsky testified that defendant had confessed that he planned Sahf's death, shot her sometime during the late night of July 13 or early morning of July 14 and then decided to burn the house, hoping that the body would be mistaken for his as a result of his earlier suicide threats.

## II.

Defendant argues that the evidence presented at trial was insufficient to support his conviction for first-degree murder. The only direct evidence of premeditation, defendant claims, was supplied by his cellmate, Quentin Swadinsky. Defendant's argument is that Swadinsky's testimony is so illogical and inconsistent that, when considered with his criminal history and motivation to lie, it is incredible as a matter of law. Without Swadinsky's testimony, defendant alleges that there is insufficient circumstantial evidence proving premeditation and that his conviction must, therefore, be reduced to second-degree (intentional) murder.

At trial, the state brought forth on direct examination Swadinsky's criminal history: that he had committed seven prior felonies and was being held for theft by swindle when he and defendant were cellmates. In addition, the defense attorney rigorously cross-examined Swadinsky about prior crimes, aliases and any favors he may have received for volunteering to testify against defendant.

It is the unique function of the jury to observe the demeanor of witnesses and weigh their credibility. *State v. Anderson,* 379 N.W.2d 70, 77 (Minn.1985). Here, the jury apparently believed Swadinsky despite hearing extensive impeachment evidence about his past criminal history and present motivation to lie.

In reviewing the premeditation/sufficiency-of-evidence claim, this court must view the evidence and any reasonable inferences that could be drawn from it in the light most favorable to the jury verdict. *State v. Rainer,* 411 N.W.2d 490, 495 (Minn.1987). The court must also assume that the jury believed the state's witnesses and disbelieved all contradictory testimony. *Anderson,* 379 N.W.2d at 77. Swadinsky's testimony was properly considered by the jury and, assuming it was believed, is sufficient to support a finding of premeditated murder. Swadinsky specifically testified that defendant told him the murder had been planned.

Even apart from Swadinsky's testimony, there is sufficient circumstantial evidence from which the jury could conclude that Sahf's murder was premeditated. A determination of premeditation must be justified by an examination of the totality of the circumstances. *State v. Jones,* 347 N.W.2d 796, 801 (Minn.1984). Events before and after a murder are relevant to such an inquiry because premeditation is a state of mind and can generally only be inferred by circumstantial evidence. *State v. Flores,* 418 N.W.2d 150, 157 (Minn.1988); *State v. Spurgin,* 358 N.W.2d 648, 651 (Minn.1984).

The relevant circumstantial evidence presented to the jury included defendant's despondency about his relationship with Sahf and threatened suicide. His statement to Ricky Carl that "We better not break up or I'll kill her." was certainly evidence the jury could use to find premeditation.

The physical evidence presented at trial included evidence of the blood alcohol content of Sahf's body. Witnesses testified that Sahf had consumed at least four glass-

es of wine on the evening of July 13. An expert gave testimony that the blood alcohol level in the body was inconsistent with a woman of Sahf's size who had consumed that amount of alcohol and died, as defendant alleges, after 3:00 a.m. Additionally, the clothing remains found on Sahf's body were remnants of her work uniform that she had been wearing the night before defendant alleges he shot her. A jury could infer from this evidence that the events of the murder occurred as described by the state—that Sahf was killed the night of July 13 or early in the morning on July 14 and not at 9:30 a.m. as the defendant alleges.

### III.

At an omnibus hearing on September 21, 1987, the defendant moved to suppress all of his statements to police in the nature of confessions because they were taken in violation of his constitutional rights. The trial judge denied the motion and was convinced that the statements were taken by the police with the utmost concern for defendant's rights. We agree. Defendant's arguments for suppression are that Lt. Johnson's interrogation on July 15 was in derogation of his asserted right to remain silent and that the state did not show a valid waiver.

The evening of the fire, after being advised of his *Miranda* rights, defendant declined to speak to Lt. Johnson. The next morning, defendant was taken to the detention center and again given his *Miranda* rights by Lt. Johnson. When asked if he understood the rights, defendant nodded affirmatively and said "sort of." Lt. Johnson then gave an abbreviated explanation of the rights he had just read, omitting the fact that anything defendant might say could be used against him. Defendant said that he understood this shortened version and proceeded to talk about killing Sahf and the events surrounding the murder.

Clearly, once a person subject to a custodial interrogation asserts the right to remain silent, the interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Unlike when an accused requests counsel, however, the police may approach suspects who initially refuse to talk and ask them to reconsider their silence. In *State v. O'Neill*, 299 Minn. 60, 216 N.W.2d 822 (1974), this court stated:

> We hold that it is not improper for the police to approach a defendant after his initial refusal to cooperate and ask him to reconsider his silence. As long as the urging to reconsider is not in any manner compulsive on a defendant and respects his asserted right not to speak, it is not constitutionally prohibited.

*Id.* at 71, 216 N.W.2d at 829. Lt. Johnson respected defendant's silence. He did not approach him again until the next day and, at that time, he again advised him of his *Miranda* rights. There is nothing in the record to suggest that Lt. Johnson's questioning was in any way coercive or threatening.

In order for a statement taken from an accused during a custodial interrogation to be admitted as substantive evidence against the accused, the state must show that the accused voluntarily, knowingly and intelligently waived his right against self-incrimination. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1630. The standard for determining the adequacy of a waiver was outlined by this court in *State v. Linder*, 268 N.W.2d 734 (Minn.1978):

> In an ordinary case if the prosecutor shows that the warning was given and that defendant stated he understood his rights and then gave a statement, the state will be deemed to have met its burden of proof, unless there is other evidence indicating that there was no knowing, intelligent, and voluntary waiver. * * * However, if there is other such evidence, then the trial court must make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was knowing, intelligent, and voluntary. * * * Factors to be considered include age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical

deprivations, limits on access to counsel and friends, and others.

*Id.* at 735.

■ Despite Lt. Johnson's abbreviated explanation of *Miranda,* the totality of the circumstances in this case suggests that defendant's waiver was knowing, voluntary, and intelligent. Defendant understood the complete warnings when they were given to him the night before his eventual statement. The police may not have even been under an obligation to repeat the warning the next morning because the questioning was by the same officer, and defendant had been under constant supervision and was certainly aware of the purposes of the investigation. *See State v. Reilly,* 269 N.W.2d 343 (Minn.1978). Before his statement, defendant was read the complete warnings twice and nodded affirmatively that he understood them both times. His "sort of" equivocation was followed by an incomplete explanation of those rights, but, keeping in mind that the adequacy of the warning is only one factor to consider, defendant's waiver was voluntary.

■ Importantly, there is no serious question, with or without the statements to Lt. Johnson, that defendant killed Sahf. The real issue is whether the killing was premeditated. In defendant's statement, he does not admit premeditation, only that he shot at Sahf to scare her. Clearly, there was sufficient evidence without the confession—both direct evidence from Swadinsky and circumstantial evidence—to enable the jury to find premeditation. *See State v. Forcier,* 420 N.W.2d 884, 886–87 (Minn. 1988) (applicable harmless error standard).

### IV.

The trial court admitted, over objection, the testimony of Mark Sahf that, in February 1987, defendant threatened to "blow [his] f___ing head off" if he intervened in the couple's financial affairs again. Defendant contends that the statement should have been excluded under the general test for relevancy because it was remote and irrelevant to any issue in the case. He also argues that it was evidence of his violent nature and, therefore, prejudicial, inadmissible character evidence.

■ If the threat is characterized as evidence tending to show defendant's propensity or disposition to commit the crime that he was charged with, it is inadmissible. *See State v. Loebach,* 310 N.W.2d 58, 63 (Minn.1981). However, the rules of evidence do allow prior bad acts to be admitted for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn.R.Evid. 404(b). As the state argues, defendant's earlier threat to Mark Sahf is relevant to show the strained relationship between defendant and victim.

Additionally, because rulings on evidentiary matters lie within the sound discretion of the trial court, they will not be disturbed absent a clear showing of abuse of discretion. *State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984). Because evidence of the prior threat was relevant to an issue of the case, the trial judge's decision to admit it, despite its prejudicial tone, was a valid use of discretion.

### V.

Defendant was sentenced in part to a consecutive 108–month sentence for attempted second-degree murder pursuant to Sentencing Guideline II.F.2. The court exercised its option to impose the 108–month sentence consecutive to (versus concurrent with) the first-degree murder sentence. The state concedes that the 108–month sentence was based on an erroneous application of the post August 1, 1987 version of the sentencing guidelines to this July 1987 offense and that, using the applicable presumptive sentence at the time, the sentence should have been 60 months. In response to defendant's motion for a sentence reduction because of the error, the state made a motion for resentencing and departure. The court denied both motions, confirmed the original sentence in all respects and amended the original "Departure Report" to reflect a durational departure to 108 months. The judge's memorandum ex-

plained that, because the method of attempted murder was particularly cruel and resulted in great pain and permanent injuries to Officer Grinde, the departure was justified. The judge stated that he had these reasons in mind at the date of the sentencing, but failed to pronounce them in the record or include them in the initial departure report.

 The sentencing guidelines allow consecutive sentences to be given in only three instances, one of which is: "When the offender is convicted of multiple current felony convictions for crimes against different persons, and when the sentence for the most severe current conviction is executed according to the guidelines." Sentencing Guideline II.F.2. (1988). In all other instances, Guideline II.F. states: "The use of consecutive sentences * * * constitutes a departure from the guidelines and requires written reasons * * *." Because the defendant's sentence for attempted murder falls within a specific exception to the general rule that sentences must be concurrent, it does not constitute a departure despite the fact that the judge used a form entitled "Departure Report."

The trial court's original memorandum outlined why the facts in this case met the II.F.2. requirements allowing him to impose a consecutive sentence. However, the original report did not set forth any other rationale which would support a departure. Because no reasons for departure were stated on the record at the time of sentencing, no subsequent departure is allowed under this court's rule in *Williams v. State*, 361 N.W.2d 840, 844 (1985).

At the time of sentencing, both attorneys and the trial judge assumed that the presumptive sentence for attempted second-degree murder would be given. All three were under the impression that the presumptive sentence was 108 months when, in fact, it was 60 months. It is impossible to predict what the court would have done had it known then that the presumptive guideline sentence was 60 months. We do know that the court intended to issue the presumptive sentence, and to allow it now to amend retroactively its reasons and de-part from the guidelines is contrary to *Williams*.

Accordingly, the trial court is affirmed except in its sentence for attempted second-degree murder. The sentence for that offense is reduced from 108 to 60 months.