**STATE of Minnesota, Respondent,**

v.

**Lawrence William JOHNSON, Appellant.**

**No. C0–90–33**

Supreme Court of Minnesota.

Nov. 30, 1990.

Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Thomas L. Johnson, Hennepin County Atty., Beverly Wolfe, Asst. County Atty., Minneapolis, for respondent.

KEITH, Justice.

Appellant Lawrence William Johnson appeals from his conviction for murder in the first degree of Norman Gonderman, Jr. on April 18, 1988. Johnson was sentenced to life imprisonment. Johnson asks this court to vacate his conviction, or, in the alternative, to reduce his conviction to one for manslaughter, on the following grounds: (I) that the trial court erred by denying his motion to suppress a statement he made during custodial interrogation, (II) that the trial court erred by refusing to dismiss the indictment, (III) that the trial court erred in admitting evidence consisting of (A) Johnson's wife's testimony at Johnson's trial and (B) evidence that Johnson performed an act of fraud one day before the death of Johnson's alleged victim, and (IV) that the evidence before the trial court was insufficient to establish Johnson's guilt for murder beyond a reasonable doubt.

Twenty-one-year-old Norman Gonderman, Jr. moved south from Glyndon, Minnesota to live with Johnson and Johnson's wife Violet, who was Gonderman's older sister, in January 1988. On January 19, Johnson had discussed with his insurance agent getting life insurance for Gonderman and for Johnson's mother, Barbara Iverslie ("Iverslie"). On February 26, Johnson, Violet, Gonderman, and Iverslie met with the insurance agent, who sold them a policy on Gonderman's life payable to Violet with a death benefit of $56,000 and a *monthly* premium of $25. The agent also sold them a policy on Iverslie with a death benefit of $25,000, with a monthly premium of $40, which included some excess cash paid in to build up cash value. Johnson and Violet paid for both policies by a single check.

While Gonderman was living with the Johnsons, friends were frequently baby-sitting Johnson's two-year-old son Billy. One baby-sitting couple, the Rodriguezes, told Johnson in March that they thought Billy was being sexually abused. Gonderman, who was "slow," or perhaps genuinely mentally retarded, moved to an acquaintance's house, although he continued seeing the Johnsons frequently at their home a few miles from the acquaintance's house. Violet made a report that Billy was being molested to the police. Billy was examined at a hospital for signs of abuse but the examination results were inconclusive. Violet testified at trial that she also told Johnson that she thought Gonderman was molesting Billy on March 23 after taking Billy home from the hospital.

On April 14, 1988, the insurance policy on Gonderman's life was delivered to the Johnsons. At the time, the Johnsons were behind in payments on several cars and had credit-card debts that were sizeable in relation to their income. On the evening of April 17, the Johnsons and the Rodriguezes went out to supper together. After the Johnsons returned home that evening, according to Johnson's testimony, Violet told him for the first time that she suspected Gonderman of molesting Billy. Gonderman came by the house that evening and Johnson and Gonderman went together to

a bowling alley where they were known by sight to the night manager. After Gonderman left the bowling alley he was not seen alive again by any witness other than Johnson.

According to Johnson's testimony, Johnson went home and went to sleep, then was awakened when Gonderman came on a visit at 1:00 a.m. on April 18. Gonderman asked Johnson to drive him to a place where Gonderman was going to pick up money from a friend before moving to Mississippi. When Johnson and Gonderman took their drive in Johnson's car, there was a 20–gauge, pump-action shotgun owned by an acquaintance of Johnson's in the back seat, where Johnson had put it the morning of April 17. They parked near where Gonderman's body was later found, and because there was no friend waiting there to give Gonderman money, Johnson became exasperated and had an argument with Gonderman. Gonderman shoved Johnson and Johnson thought Gonderman had a knife. Five-foot-ten-inch, 300–pound Johnson took the shotgun out of the back of the car, removed it from its carrying case, and threatened Gonderman with it. The shotgun discharged and hit Gonderman. Johnson testified he did not remember the second shot, which also hit Gonderman.

Gonderman's body was discovered by a commuter arriving at work at about 6:30 a.m. on April 18. Gonderman was lying on his back and had an obvious gunshot wound, with both entry and exit holes, to his head. The police gathered various forms of physical evidence from the scene, including an I.D. card of Gonderman's that showed the Johnsons' home address at 3020 Knox Avenue North in Minneapolis. Police investigators also found fragments of Federal brand shotgun waddings, a fired 20–gauge shotgun slug, and pieces of Gonderman's teeth near the body, and powder burns on Gonderman's face.

During Gonderman's autopsy a second wound was discovered on his back; that wound, which consisted of an entry hole without a corresponding exit hole, had been hidden by the supine position of Gonderman's body at the crime scene. Either the head wound or the back wound was fatal by itself. Inside Gonderman's chest was a metal fragment consistent with a 20–gauge shotgun slug.

Homicide detective Sergeant Robert Nelson and his partner Sergeant Ronald Snobeck went to 3020 Knox Avenue North from the site of Gonderman's body to see if anyone at that address could identify the victim. Violet Johnson showed the sergeants a picture of Gonderman, which looked like the victim. Violet also showed the sergeants her report that Gonderman had been molesting her son Billy. The sergeants asked Johnson if he owned any guns, and Johnson said he owned a 22 rifle but he did not know where it was. Later the same day, after the sergeants left, Johnson drove to Iverslie's house in Stearns County and gave her the 20–gauge shotgun he had in his car the previous night when Gonderman was shot.

The next day Sgt. Nelson and Sgt. Snobeck returned to talk to Johnson and Violet again and to execute a search warrant. Johnson was arrested on the street by two patrol officers at Nelson's request as Johnson was walking to his home. Johnson was put in a police interrogation room in the downtown courthouse and waited a few hours while the sergeants searched Johnson's house and contacted other officers investigating the case. The sergeants seized a box of 20–gauge Federal brand shotgun slugs and clothing that Johnson had probably worn when Gonderman was shot. The sergeants also found discarded 20–gauge slugs in public places near Johnson's home after Violet showed them places in the neighborhood where Johnson had thrown them out of the window of his car.

When Nelson returned to the courthouse building to begin interrogating Johnson, he had not recovered any shotgun shells from Johnson's garbage, which had already been collected by sanitation workers, but Nelson lied and said he had. He also said police had possession of the shotgun; in fact, Stearns County deputies picked up the 20–gauge shotgun Johnson had left with Iverslie while Johnson was in police custody. At

some point Nelson said he had Johnson nailed "dead to rights" on first degree murder; later, he softened his tone and allowed that he could understand how a man with children, like him, could be incensed enough at a child abuser to kill him. After several hours of custodial interrogation, Johnson made a statement admitting he shot Gonderman with a shotgun twice, once in the head and once in the back. The statement included Johnson's justification of hearing that Gonderman had been abusing Billy. A police typist then took Johnson's statement in question and answer form, and Johnson initialed each page of this five-page statement and signed it at the end.

A host of expert and occurrence witnesses testified at trial about the physical circumstances surrounding Gonderman's death and the personal situation of Johnson in the months before Gonderman's death. Evidence that Johnson was experiencing financial problems and had purchased life insurance on Gonderman's life was admitted in the prosecution's case in chief. Also admitted into evidence was a false police report Johnson had made about the theft of tools used in his business. The report of the tools' loss was made the day before Gonderman's death; those tools were found in Johnson's home after execution of an April 27 search warrant.

Johnson testified on his own behalf during the defense case in chief. One point of his testimony was that he had never heard from his wife about Gonderman abusing Billy until the night of April 17, just hours before Gonderman died. The trial judge made a specific ruling in chambers permitting the prosecution to call Violet Johnson as a rebuttal witness. The prosecution was allowed in rebuttal to question Violet Johnson for impeachment purposes whether she had told Johnson the previous month about the suspected abuse.

Defendant's trial representation, by a team of public defenders, was very capable during all phases of the trial. Questions submitted to the court by the jury during deliberations make undeniable that the jury considered the lesser included offenses of second degree murder and manslaughter. The jury found that Johnson acted with premeditation when he shot Gonderman to death.

1. A criminal defendant bears a heavy burden when seeking to overturn a grand jury indictment, especially when the challenge is brought after the defendant has been found guilty beyond a reasonable doubt following a fair trial. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988); *State v. Johnson*, 441 N.W.2d 460, 466–67 (Minn.1989) (dictum).

Johnson's indictment by the March, 1988 Hennepin County grand jury was dismissed by this court in *State v. Johnson*, 441 N.W.2d 460, 466 (Minn.1989). Johnson was indicted for the same offense by a later grand jury, and moved to dismiss that indictment on the ground of misconduct by police witness Sergeant Robert Nelson, the same officer who took Johnson's statement after his arrest. The trial court declined to dismiss the second indictment. Sergeant Nelson's testimony before the second grand jury to indict Johnson was so argumentative and improper that the prosecutor corrected him in the grand jury's presence, "just to be fair." Nelson frequently cast aspersions on the defense theory that Johnson's shots occurred in a heat of passion provoked by news of Gonderman's abusing Billy; Nelson stressed his personal opinion that no abuse ever happened. Nonetheless, three grand jurors asked Nelson questions about the abuse allegations, and it is apparent that the whole grand jury was aware of and considered the defense theory of provocation. Johnson's mother Iverslie also testified before the grand jury, as did Johnson's insurance agent and a member of the Hennepin County medical examiner's office. In view of the prosecutor's admonishment of Nelson, the grand jurors' persistent questioning of Nelson, and the physical evidence and motive evidence placed before the grand jury, it cannot be said that Nelson's misconduct corrupted the grand jury's decision.

In the end, a petit jury convicted Johnson of first degree murder after a vigorous

defense at trial. In view of this result, the state urges this court to adopt the rule applied in federal cases by *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), and hold that the petit jury verdict means *per se* that no dismissal of the grand jury indictment is required. After carefully considering the *Mechanik* decision we decline to adopt its rule for Minnesota's courts. We continue to permit, in cases in which the grand jury process is challenged, petition to the Court of Appeals for pre-trial discretionary review of whether the evidence before the grand jury was sufficient to establish probable cause. *Johnson*, 441 N.W.2d at 467. The Court of Appeals dismissed Johnson's petition for discretionary review after his second indictment. In this case, sufficient evidence was placed before the grand jury to indict Johnson.

2. Johnson claims three serious defects occurred during custodial interrogation by Sergeant Nelson that require his inculpatory statement to be suppressed. Because these claimed defects implicate the rights of the accused protected by the Minnesota and federal constitutions, we review them point-by-point.

█ First, Johnson claims he asked for the assistance of a lawyer before Nelson began questioning him at the police interrogation room at the courthouse, repeating his request several times. If a suspect invokes the right to counsel, custodial questioning must stop until counsel is provided for the suspect. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). On a motion to suppress statements made after invoking counsel, the trial court makes a factual finding of whether in fact the right to counsel was invoked. On review, this court examines the whole record to make sure the finding was not erroneous. *State v. Anderson*, 396 N.W.2d 564, 565 (Minn. 1986). Sergeant Nelson said at the Rasmussen hearing that Johnson began talking without invoking counsel. The trial court ruled specifically on the obvious credibility dispute in the conflicting testimony of Johnson and Nelson, resolving the credi-

bility issue in favor of the state. Nothing appears in the record to indicate that this trial court determination was in error.

█ Second, Johnson claims he notified Nelson of his intention to use his right to silence while in custodial interrogation. Once a person subject to custodial interrogation asserts the right to remain silent, interrogation must cease. *State v. Thieman*, 439 N.W.2d 1, 5 (Minn.1989). The trial court makes a factual finding of whether in fact the right to silence was invoked. On review, this court examines the whole record to make sure the finding was not erroneous. *Anderson*, 396 N.W.2d at 565. In this case, the defendant testified at the omnibus hearing that he spoke to police after an interval of no questioning following his invocation of right to counsel. Sergeant Nelson testified at the hearing defendant began talking as soon as Nelson read him his *Miranda* rights in the interrogation room. The trial court found that defendant had not invoked his right to silence before he made his inculpatory statement. Nothing appears in the record to indicate that this trial court determination was in error.

█ Third, Johnson claims that the overall circumstances surrounding his confession made it involuntary and a violation of due process as a matter of law. In *State v. Merrill*, 274 N.W.2d 99 (Minn. 1978), we held that involuntary statements by defendants must be suppressed. The test we follow, conformably to federal law on the same subject, is that if the totality of the circumstances show the will of the accused was overborne, the confession is involuntary. *Id.* at 106. A confession can be involuntary even if it follows a waiver of the right to silence. *Id.* at 106 n. 4. No threats or intimidation in the interrogation need be shown for a finding of involuntary confession. *Id.* at 107.

█ In *State v. Thieman*, 439 N.W.2d 1, 5 (Minn.1989), we reviewed standards for gauging voluntariness of a confession established in *State v. Linder*, 268 N.W.2d 734 (Minn.1978). The evidence that calls into doubt whether defendant's inculpatory statement was voluntary is defen-

ant

dant's later testimony at the *Rasmussen* hearing. Factors to be considered include age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, and limits on access to counsel and friends. *Thieman*, 439 N.W.2d at 5–6. Johnson was 29 years old; had been working full time and living with his own family for several years; appears on the record to have normal intelligence and literacy; apparently attended high school; had been arrested, given *Miranda* warnings, and interrogated before this case arose; and had normal ability to comprehend. Johnson disputes the adequacy of warnings about interrogation in this case, but had experience with arrest. He was interrogated about five hours, after public arrest in connection with lawful execution of a search warrant issued on probable cause. He disputes the nature of the interrogation, saying violence was threatened, contrary to police testimony that only "good cop, bad cop" changes of tone were used. Johnson was offered water and cigarettes before interrogation by his own testimony; and although undisputedly he had no access to counsel or friends, it is disputed whether he asked for access. Defendant's confession occurred after he was told by Nelson about the various forms of physical evidence the police had discovered in the case. The trial court observed the *Rasmussen* hearing testimony and found that defendant's statement was voluntary. Having reviewed the factors set out in our precedents, we find no error in the trial court's resolution of this issue.

Johnson's redacted statement was read into evidence by Sgt. Nelson at trial. Johnson testified at trial that the two signatures purporting to be his on the five-page inculpatory statement are indeed his own, and that he initialed each page with his own hand. When moving for suppression, Johnson said that he was attempting to cross out the *Miranda* warning on the typed statement when Nelson threatened him with physical violence if he did so. The typed statement appears in the appellate record and bears no marks but John-

son's signatures at the end, a few corrections by Johnson, and Johnson's initials on each page.

"In cases in which the claim is made that a confession was involuntary or that the waiver of the *Miranda* rights was involuntary, the trial court must make a subjective factual inquiry into all the circumstances surrounding the giving of the statement. On appeal this court will not reverse any findings of fact unless they are clearly in error, but this court will make an independent determination of voluntariness on the facts as found." *State v. Hardimon*, 310 N.W.2d 564, 567 (Minn.1981). Nothing in the record causes us to doubt the trial court's credibility determination that Johnson did not invoke counsel, did not invoke his right to silence, and was not coerced into a confession.

3. Marital privilege cases in Minnesota are relatively rare. When waiver of the marital privilege is in dispute, this court will review the record to see whether the trial court's finding of waiver was clearly erroneous.

 This court has previously considered the policies underlying the marital communication privilege in another first degree murder case, *State v. Clark (Clark II)*, 296 N.W.2d 372, 375–76 (Minn.1980). In *Clark II*, the waiver by defendant consisted of a failure to object, at his earlier trial for the murder of another victim, to testimony by the defendant's wife about receiving a long-distance phone call from him. The *Clark II* court's unanimous opinion reasoned that once the marital communication was made public by the testimony in the *Clark I* trial, there was no longer any policy basis for protecting the communication that overcame the policy of ensuring judicial access to truth. 296 N.W.2d at 376. Similarly, in *State v. Hannuksela*, 452 N.W.2d 668, 676 (Minn.1990), which presented a marital privilege scope issue rather than waiver issue, this court expressed an aversion to "erecting artificial 'barriers to the ascertainment of truth.'" *Id.* at 676 (citing *Larson v. Montpetit*, 275 Minn. 394, 402, 147 N.W.2d 580, 586 (1966)).

Just as *Hannuksela* construes the scope of the marital privilege narrowly to safeguard truth-finding, we here set a waiver threshold that will allow the finder of fact maximum access to relevant evidence. Defense counsel at one point in the defense case in chief had told the judge at the bench he was prepared to waive the marital privilege for a different purpose of showing what Mrs. Rodriguez said to Violet. As this case unfolded at trial, Johnson made the first move to bolster his theory of heat of passion under provocation by testifying in his own defense that after a conversation with his wife on the night Gonderman died, he concluded that Gonderman had molested his son Billy. On cross-examination, Johnson testified that Violet never told him about Gonderman molesting Billy before the evening of April 17, 1988, only hours before Gonderman was shot. It bears pointing out that at the time of Johnson's trial, Violet had already been convicted of Gonderman's murder in a separate trial, although this was never apparent to the jury in any of the proceedings on record. Violet's appearing to testify was the subject of vigorous legal arguments in chambers before the judge ruled her testimony admissible for the limited purpose of impeaching Johnson's testimony of when Violet told him of the child abuse allegations.

Violet was given transactional-use immunity for all of her testimony in Johnson's trial. The prosecution conducted a narrowly focused direct examination of Violet in its rebuttal to show earlier notice to Johnson of the abuse. The prosecution's examination of Violet Johnson at Johnson's trial was strictly limited to this issue of notice. We hold that the trial court's ruling that defendant waived the marital privilege under Minn.Stat. § 595.02 subd. 1(a) was not clearly erroneous.

4. Iverslie told police after Gonderman died that Johnson and Violet had a life insurance policy on Gonderman's life and that they were under financial pressure. Police investigation revealed that Johnson had the day before Gonderman's death reported stolen about $6,000 worth of the tools used in his auto-repair business. But when the police executed a search warrant on April 27, the tools were in fact still in Johnson's house. The prosecution thereafter gave notice that it intended to use the evidence of the false police report to show that Gonderman's death was part of a premeditated plot to recover insurance money. Johnson challenges the admission of that evidence in this appeal.

■ Johnson received the notice required by *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), and Minn.R.Crim.P. 7.02, of the prosecution's desire to admit the false police report evidence. The trial court ruled the evidence admissible. *State v. Filippi*, 335 N.W.2d 739 (Minn.1983), requires that trial courts admit such evidence of bad acts only when (1) the evidence is relevant and material to the state's case, (2) the evidence of the defendant's participation in the act is clear and convincing, and (3) the probative character of the evidence outweighs its potential for unfair prejudice. *Id.* at 743. The evidence was offered to establish motive, a relevant issue in a homicide case in which the defendant has admitted causing the death of the victim. The close connection in time (two consecutive days) makes the theft-report/attempted insurance fraud scheme relevant to the fraud scheme alleged in Gonderman's death. Clear and convincing evidence of Johnson's participation was presented to the trial court in the form of police testimony and documentary evidence about, first, Johnson's report, and, second, the search of Johnson's house that revealed the tools were still at home after the report was filed. The evidence is probative on the issue of motive, but it is doubtful that a jury would convict for first degree murder a person whom the jury suspected only of an insurance fraud scheme involving a false report of theft. The minimal prejudicial effect of the false report evidence would not prevent a jury from considering each element of the charge of first degree murder on the facts of this case.

This court will not reverse a trial court's admission of evidence of bad acts unless an abuse of discretion is clearly shown. *State v. Scruggs*, 421 N.W.2d 707, 715 (Minn.

1988). No such abuse of discretion appears on the record in this appeal.

■■■ 5. On the final issue of overall sufficiency of the evidence to convict Johnson, we find that sufficient evidence was lawfully presented at trial to allow a reasonable jury to convict Johnson of murder in the first degree.

The jury's verdict and trial court's judgment that defendant Lawrence William Johnson is guilty of murder in the first degree is affirmed.