STATE of Minnesota, Respondent,

v.

Gary H. TOMASSONI, Appellant.

No. A08–1879.

Supreme Court of Minnesota.

Feb. 18, 2010.

Lori Swanson, Attorney General, St. Paul, MN, Robert M.A. Johnson, Anoka County Attorney, Marcy S. Crain, Assistant Anoka County Attorney, Anoka, MN, for respondent.

Roy G. Spurbeck, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

On July 21, 2007, appellant Gary Tomassoni shot and killed his wife of 24 years. A grand jury indicted him for first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2008). Tomassoni admitted killing his wife, and his sole defense was that the killing was not premeditated. The jury found him guilty of first-degree premeditated murder, and he received a sentence of life imprisonment without the possibility of release. He now appeals, arguing that his conviction should be overturned because during closing argument, the prosecutor used evidence that had been admitted solely to impeach Tomassoni's credibility for the substantive purpose of proving premeditation. Tomassoni also raises several arguments in a pro se supplemental brief. We affirm.

Gary Tomassoni and his wife were married in 1983. At the time of the events leading up to the homicide that is at issue in this case, Tomassoni and his wife resided in Blaine, Minnesota, with the younger of their two sons. The Tomassonis' marriage appeared to be happy to their sons and others who knew them. Nothing in the record suggests any history of violence or conflict between them.

On the afternoon of July 20, 2007, Tomassoni and his 14–year–old son went for a bike ride. Later in the evening, Tomassoni went biking again, this time with his wife. The couple returned after dark and Tomassoni's wife went to bed. Their son was in his bedroom watching television until after midnight, when Tomassoni told him to go to sleep.

At about five o'clock on the morning of July 21, the Tomassonis' son was awakened by a loud noise. He walked from his bedroom in the lower level of the Tomassoni family's split-level home to the upper level to use the bathroom. When he left the bathroom, his father told him to call 911 because an intruder had entered the house. Tomassoni's son made the phone call, and both Tomassoni and his son spoke to the 911 dispatcher. Tomassoni said that his wife may be dead, and that the intruder may have left the house through an open downstairs window.

Police officers quickly arrived at the house, where they found Tomassoni's wife dead, lying face down on her bed. She had sustained two gunshot wounds to the

head. Tomassoni and his son were both visibly upset. Tomassoni was sweating and had a cut on his right index finger. He told police that he had been sleeping on the couch in the living room when he was awakened by a sound like a firecracker or a single gunshot. He said that he heard his wife say, "What was that?", and then he went to the bedroom, where he saw her lying face down holding the back of her head.

During their initial sweep of the house in search of an intruder, the police observed blood stains in various locations around the house. There was blood on the bed and on the bedroom floor, on the bathroom sink, on the bathroom floor, on the bath mat, in the kitchen on the telephone and the trash can, on the stair railings leading to the lower level, and on a light switch downstairs. A window in the lower level of the house was partially open. The screen had been removed, and was found bent and damaged inside the room. No footprints were observed in the grass outside the window, which was wet with morning dew.

After obtaining a warrant, the police performed a comprehensive search of the home. They recovered a bullet from the headboard near the body, a cartridge casing from the bedroom floor, and four small pieces of blue rubbery material from the floor in the bedroom, bathroom and the lower level of the house.

In a lower-level room, the police found a locked file cabinet and broke it open to examine its contents. Inside, a folder with a blood drop on it contained insurance documents. The same drawer of the cabinet contained a small fire safe with duct tape on the inside of its lid. The safe held a .32 caliber handgun, a pair of blue rubber gloves that had been torn in places, and a second spent bullet casing. A small piece of blue rubbery material was embedded in the slide of the gun.

The police also found a black coat, a shirt, and a pair of shorts in the washing machine. All of the clothing had blood on it and had not been washed. In the pocket of the shorts, police found a set of keys that included the key to the filing cabinet where the gun had been located. A box of blue rubber gloves and a partial roll of duct tape were found in the garage.

The police interviewed Tomassoni at the police station on the morning of the murder, while the search of his home was taking place. Tomassoni told the same story he had told earlier at the house—that he was awakened by someone saying, "Where's the money" or "Give me the money," and then a noise like a firecracker. He believed an intruder had been in the house. After learning about the gun and the gloves in the downstairs filing cabinet and the blood spots found throughout the house, the interviewing officer confronted Tomassoni with this information. Tomassoni appeared nervous and started sweating, but did not admit killing his wife. He was ultimately arrested and charged with the murder.

The following day, Tomassoni spoke with his sister by phone. He told her to help his older son with the life insurance policy in the filing cabinet, and to use the money to pay off debts that Tomassoni owed. Tomassoni also told his sister that he thought he was going crazy. A day or two after that phone call, Tomassoni spoke with an Anoka County child protection worker regarding the placement of his younger son. Tomassoni told the child protection worker that he had shot his wife. The parties agreed before trial that Tomassoni's statement to the child protection worker could not be used in the State's case in chief because it was taken in violation of his Fifth Amendment rights

under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The State presented extensive forensic evidence at trial. The medical examiner who performed the autopsy testified that Tomassoni's wife sustained two gunshot wounds to the head. One shot grazed the top of her skull and lodged in the headboard. According to the medical examiner, the grazing shot likely occurred first, and the victim then raised her hands to her head in response. This scenario would place the victim's hands near her head when the second shot was fired, explaining the gun powder abrasions on the backs of her hands and arms. The second shot entered the victim's brain and was immediately fatal. That bullet was recovered during the autopsy, and the parties stipulated that the gun found in the filing cabinet had fired both bullets. Similarly, the parties stipulated that forensic testing connected the gun with the casing found on the bedroom floor and the one found in the cabinet with the gun.

A technician from the Minnesota Bureau of Criminal Apprehension testified about the duct tape and the rubber pieces found around the house. The technician concluded that three out of the four small blue rubber pieces had been ripped from the pair of gloves found in the safe with the gun. In addition, he concluded that the duct tape in the fire safe had been torn from the roll of tape found in the garage.

The parties stipulated to the results of DNA tests from various blood samples. Blood on the washing machine, the shorts and jacket inside the washing machine, the gun, and the rubber gloves matched Tomassoni's DNA profile. Blood on the pair of shorts also matched the victim's DNA profile.

M.M., the Tomassonis' neighbor, testified that she returned home from work at 3:06 a.m. on the morning of July 21. She spent the next hour talking with her teenage daughter and two other girls who were at the house for a sleepover. The group was in the daughter's bedroom, which faced the backyard on the upper level of their house. That night, the windows in the bedroom were slightly open. M.M. testified that sometime between 4:00 and 4:10 a.m., the three girls jumped or flinched because they heard a noise.

M.M.'s daughter testified that she heard "two unusual sounds" that were "a lot like metal being pushed down and then popping back up." She stated that the second sound was fainter than the first. Both of the daughter's friends testified that they heard only one sound.

A prisoner who had been housed with Tomassoni at the Anoka County jail also testified as an informant on behalf of the State. The informant acknowledged that he was testifying in hopes of receiving a reduced sentence on a federal drug conviction. He testified that he overheard Tomassoni telling the story of the murder to another person. Tomassoni purportedly told the person that he got a gun, put on gloves, shouted at "the lady" to give him the money, and shot her. The informant testified that "the lady" then woke up, said her head hurt, and Tomassoni shot her again. When asked which lady Tomassoni was referring to, the informant testified that it was Tomassoni's wife. The informant went on to recount Tomassoni's alleged statements that he went to the basement, hid the gun and gloves, opened a window and ripped its screen, spoke to his son, and put his clothes in the washing machine.

Several witnesses testified that Tomassoni owed them large amounts of money. In 2006, Tomassoni began borrowing significant sums from friends and former coworkers. He used the money to purchase

and rehabilitate homes. Initially, his efforts were successful and he repaid the money along with profits to the lenders. But his ventures eventually failed. Tomassoni owed $38,500 to a neighbor, $120,400 to a former coworker and his wife, $25,000 and $80,000 to two other former coworkers, and $16,500 to a friend. Tomassoni had promised to pay back $70,000 of the largest of these debts on the evening of July 21, 2007—the day of the murder. In addition, Tomassoni had lost a total of $432,939 gambling at two local casinos between 2004 and the date of the murder.

Tomassoni's wife was covered by two life insurance policies. The first, through her employer, was worth $147,000. Tomassoni was a 50% beneficiary under that policy. The second policy was for $500,000, and Tomassoni was the sole beneficiary.

Tomassoni testified in his own defense. He stated that he had not planned to kill his wife, that he loved her, and that the day he killed her was the worst day of his life. He recounted the evening's events, including the bike ride with his wife. Tomassoni testified that because of the heat, he planned to sleep that night on the living room couch. After his wife and son were asleep, Tomassoni testified that he sat on the couch and started thinking about his parents and his family and wondering whether he had failed to be there for them. He testified that he decided to end his life, and went to get the gun from the filing cabinet downstairs for that purpose. Tomassoni testified that he had attempted suicide once before, by taking a large dose of sleeping pills.

After retrieving the gun from the lower level of the house, Tomassoni stated that he went into the garage and continued thinking. He testified that he then went to his son and kissed him on the head, went to his wife and kissed her on the cheek, and then returned to the couch. Tomassoni stated that the next thing he remembered, he was standing in the hallway outside his wife's bedroom, dripping with sweat and wearing gloves, with the gun in his hands, and his wife was dead.

The State used Tomassoni's statement to a child protection worker to impeach his credibility regarding his version of events. Tomassoni acknowledged on cross-examination that he had told the child protection worker that he recalled standing over his wife's bed wearing gloves and a coat, holding the gun. He recounted watching a digital clock count down to one and pulling the trigger twice. Tomassoni also stated that after the first shot, his wife was holding her head and she said something to him.

Closing arguments in the trial focused exclusively on the issue of premeditation. Tomassoni's counsel urged the jury to believe Tomassoni's version of events—that he did not plan to kill his wife and performed the shooting in a desperate, suicidal, panicked state. In contrast, the State highlighted Tomassoni's extensive debt and gambling losses, his promise to repay $70,000 to a former coworker on the day of the murder, and his wife's sizable life insurance policies. The State also noted that Tomassoni put on a coat and gloves, and argued further that the forensic evidence showed at least a brief passage of time between the two shots, when the victim raised her hands to her head. In addition, the State reminded the jury of Tomassoni's extensive attempts to cover up the killing by hiding evidence and concocting a story about an intruder.

The jury found Tomassoni guilty of first-degree premeditated murder under Minn. Stat. § 609.185(a)(1). The court then imposed a sentence of life imprisonment without the possibility of release. Tomassoni appealed his conviction to our court.

## I.

Tomassoni's appeal focuses primarily on one statement by the State that Tomassoni argues constituted prosecutorial misconduct. Near the end of closing argument, the prosecutor stated: "[Tomassoni] admitted that he told the social worker ... that he shot his wife once, there was a pause, and he shot her a second time. That's premeditated. He planned to kill his wife." Tomassoni asks this court to reverse his conviction because the statement from the social worker was admitted at trial only for the purpose of impeachment, not as substantive evidence of premeditation.

 Tomassoni's counsel did not object to the prosecutor's statement during the trial. The issue is therefore subject to plain-error review on appeal. *State v. Ramey,* 721 N.W.2d 294, 299 (Minn.2006). If Tomassoni can establish that an error was made and it was plain, the burden then shifts to the State to demonstrate that the error did not affect his substantial rights. *Id.* at 302. An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Id.* An error affects a defendant's substantial rights unless the state can "show that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (internal quotation marks omitted). In determining whether the State has met this burden, we consider "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Davis,* 735 N.W.2d 674, 682 (Minn.2007).

 A statement made by a defendant in custody is inadmissible unless the suspect is given a *Miranda* warning and he voluntarily, knowingly and intelligently waives the constitutional rights to counsel and right against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Thieman,* 439 N.W.2d 1, 5 (Minn.1989). Here, the parties agree that admission of Tomassoni's statement to the child protection worker as substantive evidence against him would violate this rule. The parties also agree that despite the *Miranda* violation, the statement was voluntarily given and is thus admissible for the purpose of impeaching Tomassoni's conflicting testimony at trial. *See Oregon v. Hass,* 420 U.S. 714, 722–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *State v. Slowinski,* 450 N.W.2d 107, 111 (Minn.1990) ("A confession obtained in violation of [a] defendant's constitutional right to counsel may be used for the purposes of impeachment, but only if voluntary.").

Relying on these principles, the parties agree that the State's substantive use of Tomassoni's statement as evidence of premeditation was error. Tomassoni argues that the error was plain. The State counters that the error was not plain because Tomassoni "cites no authority for the proposition that it is prosecutorial error to use properly admitted impeachment evidence substantively in closing argument."

 Here we need not decide whether the error was plain, because the State has met its burden of establishing that any error in the use of the statement did not affect Tomassoni's substantial rights. *See, e.g., State v. Jackson,* 714 N.W.2d 681, 697 (Minn.2006) (declining to address the plain error prong of the standard because the substantial rights question was dispositive). The State presented extensive evidence of premeditation in addition to Tomassoni's statement to the child protection worker. This included strong evidence of a motive—Tomassoni's need for his wife's

life insurance money—and evidence that he went to great lengths to cover up his act. The State also presented independent evidence in the form of forensic evidence, the informant's testimony, and the testimony of the teenage neighbor that a short amount of time elapsed between the two shots. The prosecutor's brief substantive argument based on evidence admitted only for impeachment thus did not have "significant evidentiary value to the state." *Cf. State v. Ray*, 659 N.W.2d 736, 743 (Minn. 2003) (holding that the erroneous admission of an illegally obtained statement was not harmless in part because of its evidentiary value). We hold that the State has met its burden of showing that the error did not affect Tomassoni's substantial rights because there is no reasonable likelihood that the jury's verdict would have been different if the prosecutor had not made the argument. *See Ramey*, 721 N.W.2d at 302.

Tomassoni also argues that the State's use of his statement to the child protection worker was exacerbated by corresponding jury instruction. The district court instructed the jury that: "Evidence of any prior inconsistent statement or conduct should be considered only to test [the] believability and weight of the witness's testimony. In the case of the defendant, however, evidence of any statement he may have made may be considered by you for all purposes." *See* 10 Minn. Dist. Judges Ass'n, *Minn. Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.15 (5th ed. 2008). The final line of this instruction correctly describes the rule of evidence that a statement made by a defendant is not hearsay and is therefore admissible when it is offered against the defendant. *See* Minn. R. Evid. 801(d)(2). However, the issue in this case relates to a *Miranda* violation, not a hearsay problem. The State thus concedes that the court erred when it included the final line of the

jury instruction. Tomassoni did not object to the instruction at trial, and plain-error review therefore applies. *Ramey*, 721 N.W.2d at 299–300.

■ We conclude that the error in the jury instructions did not affect Tomassoni's substantial rights for the same reasons that the prosecutor's statement did not. Although the jury might have followed the erroneous instruction and used the child protection worker's statement for the substantive purpose of deciding whether Tomassoni acted with premeditation, the evidence was one small piece of the otherwise extensive evidence of premeditation. Accordingly, we conclude that there is no reasonable likelihood that the jury's possible substantive use of the statement to the child protection worker had a significant effect on the verdict, and hold that any error in the jury instruction did not affect Tomassoni's substantial rights.

## II.

Tomassoni raises several additional arguments in a supplemental pro se brief. He argues: (1) that he was denied effective assistance of counsel, (2) that the State erred in its examination of the informant witness, (3) that the district court made an improper comment to the jury and gave an incorrect jury instruction, (4) that the jury selection was unfair, and (5) that he was prejudiced by the involvement of too many women in his trial. We address each of these arguments in turn.

### A.

■ Tomassoni argues that the pregnancy and heavy workload of one of his defense attorneys rendered her ineffective. Although the attorney did experience a pregnancy-related health problem during the trial that resulted in a 1–day delay, the record reflects that she was not ineffective

in representing the defendant. In addition, Tomassoni argues that his counsel was ineffective in failing to seek a mental illness evaluation under Minn. R.Crim. P. 20.01. But he provides no factual support for this argument, and the record contains no evidence that he would have been eligible for such an evaluation. *See State v. Bartylla,* 755 N.W.2d 8, 22–23 (Minn.2008) (noting that this court does not consider pro se claims on appeal that are not supported by argument or citation to legal authority).

### B.

Tomassoni next argues that the State acted improperly in the direct examination of the informant witness. A portion of the testimony proceeded as follows:

Q: And what else did [Tomassoni] say he was doing?

A: He said that he walked into the lady's room and shot her once.

Q: What did he shout?

A: He said that he was yelling, "Give me the money," or something like that.

Q: I'm sorry. I might have misunderstood you. Did you say he shouted or—

A: Shouted.

Q: So he walked in the bedroom. And what did he do?

A: He shouted "Give me the money," and then—

Q: Then what?

A: And then he shot the lady once.

According to Tomassoni, the prosecutor's question, "What did he shout?", was an attempt to feed information to the witness and guide his testimony. But the transcript reflects instead that the prosecutor likely heard the word "shout" when the witness said "shot." The prosecutor thereafter quickly corrected the misunderstanding.

■ In any case, the witness's testimony that Tomassoni allegedly shouted something about money before shooting his wife was not consistent with the State's theory of the case. The testimony was instead consistent with Tomassoni's invented intruder story, a fact that undercut the informant's credibility. The testimony was not helpful to the State. Therefore, any error here could not have prejudiced Tomassoni. *See Ramey,* 721 N.W.2d at 299 (holding that where an error does not draw an objection at trial, the court will not reverse unless the error affected the defendant's substantial rights).

■ Tomassoni also argues that the informant's testimony improperly suggested to the jury that Tomassoni was incarcerated at the time the informant allegedly heard him telling another person about the murder. Indeed, the jury might have inferred from the statement that the informant "was going to be transported to another place" that both Tomassoni and the informant were incarcerated when the conversation occurred. But there is no "general rule that it is prejudicial for the jury to learn that a defendant is in jail" before or during a trial. *State v. Manthey,* 711 N.W.2d 498, 506 (Minn.2006). The district court properly instructed the jurors on the presumption of innocence, and Tomassoni was not prejudiced by any potential inference of incarceration drawn from the informant's statement.

### C.

Tomassoni next argues that the district court erred when it instructed the jury, "Once the facts are decided, you must follow the law. You must follow the law, even if you do not agree with it." Tomassoni cites *United States v. Norton,* 846 F.2d 521 (8th Cir.1988), to support his assertion that the jury instruction was erroneous. In *Norton,* the Eighth Circuit

affirmed a conviction despite the district court's omission of a model jury instruction. *Id.* at 524. The court noted that the instruction was only a model and not a requirement. *Id.* at 525. Here, by contrast, the instruction at issue is a standard instruction that correctly states the jury's duty to apply the law to the facts. *See* 10 Minn. Dist. Judges Ass'n, *Minn. Practice—Jury Instruction Guides, Criminal,* CRIMJIG 1.02B (5th ed. 2008).

■ Tomassoni also objects to a statement made by the district court to the jurors before the start of proceedings one morning during the trial. A newspaper had incorrectly reported that the judge stated that Tomassoni's trial would last 6 weeks, and the judge assured the jury that the trial was expected to last only about 2 weeks. The record clarifies that the judge made this statement simply to assist the jury with work and family arrangements, in case someone had relayed the false information from the newspaper to a juror. This statement did not amount to a time limit on Tomassoni's trial, and no time restrictions were placed on Tomassoni's presentation of his defense.

### D.

■ Both prosecutors, both defense attorneys, the judge, and nine of the jurors in Tomassoni's trial were women. Tomassoni argues that because the victim was also a woman, he was prejudiced by the fact that many of the people involved in his case were female. This novel argument, advanced without any citations to the record or legal authority, essentially amounts to an assertion that women are inherently biased in favor of other women and against men. We find no merit in Tomassoni's argument. After thoroughly reviewing the record, we agree with the State's assertion that the attorneys and the judge in this case "ensured that Tomassoni received a vigorous defense, a fair prosecution and a just result."

### E.

■ Tomassoni finally argues that he was prejudiced by the jury selection procedures, which he asserts excluded lower income people from jury service. To make a prima facie case that the jury does not represent a fair cross section of the community, a defendant must show that the allegedly excluded group is "distinctive," that the group "was not fairly represented in the jury venire," and that the underrepresentation resulted from systematic exclusion of the group in question. *State v. Willis,* 559 N.W.2d 693, 700 (Minn. 1997). Tomassoni has not made such a showing.

Affirmed.