STATE OF MINNESOTA

IN SUPREME COURT

A13-1801

Hennepin County                                                    Stras, J.

State of Minnesota,

        Respondent,

vs.                                                    Filed:  April 8, 2015
                                                       Office of Appellate Courts

Nisius Dealvin McAllister,

        Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Melissa Sheridan, Eagan, Minnesota, for appellant.

_____

S Y L L A B U S

1.     The record contains sufficient evidence to support the conviction of first-degree premeditated murder.

2.     The error, if any, in admitting recordings of portions of the appellant's interrogations into evidence at trial was harmless beyond a reasonable doubt.

Affirmed.

1

STRAS, Justice.

Based on a homicide that occurred during an aggravated robbery, a jury found appellant Nisius Dealvin McAllister guilty of first-degree premeditated murder and first-degree felony murder. The district court entered a judgment of conviction of first-degree premeditated murder, and sentenced McAllister to life imprisonment without the possibility of release. McAllister challenges his conviction on two grounds. First, he argues that the State's evidence was insufficient to prove that he intentionally aided another in committing the murder. Second, he argues that the district court erred when it admitted recordings of portions of his interrogations into evidence that included statements he made after allegedly invoking his right to remain silent. We affirm.

I.

Michael McMillan was shot and killed after enduring a brutal beating at the hands of three men: McAllister and two of his nephews, Leondis McAllister ("Leondis") and Justin Fineday ("Fineday"). These events occurred early in the morning in an alley in south Minneapolis, where four eyewitnesses saw McAllister and his nephews repeatedly punch and kick McMillan. During the beating, the men removed McMillan's clothes and one of the men shot him. At trial, multiple witnesses testified that, after the three men fled from the alley, one of the men returned to shoot McMillan again. McMillan died 2 weeks later of an infection from gunshot wounds to his neck and lower back.

Just a few minutes after the shooting, police officers arrested McAllister and Fineday approximately two blocks south of the alley, while another officer arrested

Leondis on the same block where the officers arrested the other two men. Among other things, the officers discovered two cellphones, a set of keys, and an envelope and a piece of paper both bearing McMillan's name near the location where the officers arrested McAllister and Fineday. The officers also found a loaded .380 semiautomatic pistol—the same caliber handgun used to shoot McMillan—in a nearby flowerbed.

Following the arrests, two police officers interrogated McAllister. During the interrogation, McAllister eventually admitted that he was present during the altercation and implied that he knew the identity of the shooter. Nevertheless, he was unwilling to disclose the shooter's identity, and expressed frustration that neither of his nephews was willing to admit involvement in the crime. After several hours in the interrogation room, McAllister stood up, removed his watch, sat back down, and then told the officers, "[n]o, ain't no sense in talking no more man. You may as well cuff me up, book me, whatever. It's just that simple." Following that statement, the officers continued to speak with McAllister for about 20 minutes before terminating the interrogation and handing him a business card in case he changed his mind.

Before beginning the booking process, the officers allowed McAllister to see Leondis, who told McAllister that he had admitted his involvement in the crime. At that point, McAllister immediately asked to speak with the officers again. Ten minutes after the initial interrogation ended, the officers resumed the interrogation, without issuing a second *Miranda* warning to McAllister. McAllister then provided additional details about the crime that he had not previously disclosed to the officers. The officers again

3

interviewed McAllister 2 days later, focusing their questions primarily on which of the two nephews was the shooter.

Prior to trial, McAllister moved to suppress the portions of his interrogation that followed his statement, "ain't no sense in talking no more man." The district court denied the motion, concluding that McAllister's statement did not constitute an unambiguous invocation of his right to remain silent. At trial, the State played recordings that included significant portions of McAllister's interviews with the police. The State's theory of the case was that McAllister was an accomplice to the murder committed by one of his two nephews.

The jury found McAllister guilty of both first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), and first-degree felony murder during the commission of an aggravated robbery, Minn. Stat. § 609.185(a)(3). The district court entered a judgment of conviction on the first-degree premeditated murder count and sentenced McAllister to life in prison without the possibility of release. *See* Minn. Stat. § 609.106, subd. 2(1) (2014).

II.

The first question presented by this case is whether the State introduced sufficient evidence to prove McAllister's guilt as an accomplice to McMillan's murder. A person is liable for an offense committed by another person as an accomplice if he or she "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures [another person] to commit the crime." Minn. Stat. § 609.05, subd. 1 (2014) (the "accomplice-liability statute"). The phrase "intentionally aids" includes two "important and necessary principles: (1) that the defendant 'knew that his alleged accomplices were

4

going to commit a crime,' and (2) that the defendant 'intended his presence or actions to further the commission of that crime.' " *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (quoting *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007)). Under the next provision in the statute, an accomplice is also criminally "liable" for "any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2 (2014).[1]

McAllister's sufficiency-of-the-evidence argument focuses exclusively on the fact that he did not intend to aid a murder. But even if he did not "intentionally aid[]" a murder, as he argues, he is still liable under Minn. Stat. § 609.05, subd. 2, for any crimes committed "in pursuance of" the crime he intended to aid—in this case, an aggravated robbery. Thus, sufficient evidence exists for McAllister's conviction under subdivision 2, regardless of whether he knew that one of his nephews would kill McMillan, if: (1) he was an accomplice in the aggravated robbery; (2) the murder was committed in furtherance of the aggravated robbery; and (3) the murder was reasonably foreseeable as a probable consequence of the aggravated robbery. *See State v. Swanson*, 707 N.W.2d

---

[1]    Minn. Stat. § 609.05, subd. 2, is a codification of the natural-and-probable-consequences rule that a number of states have adopted in the context of accomplice liability. *See, e.g.*, *State v. Delestre*, 35 A.3d 886, 895-96 & n.10 (R.I. 2012) (describing the majority rule); *People v. Prettyman*, 926 P.2d 1013, 1019-21 (Cal. 1996) (discussing the reasonable-foreseeability and in-furtherance-of requirements of the natural-and-probable-consequences rule); *see also State v. Barrett*, 40 Minn. 77, 80, 41 N.W. 463, 464 (1889) (applying the pre-statutory natural-and-probable-consequences rule in Minnesota); 2 Wayne R. Lafave, *Substantive Criminal Law* § 13.3, at 361-62 & n.28 (2d ed. 2003) (listing states, including Minnesota, that have codified the natural-and-probable-consequences rule).

5

645, 659 (Minn. 2006); *see also State v. Valtierra*, 718 N.W.2d 425, 438-39 (Minn. 2006) (stating in an accomplice-liability case that murder may be a probable consequence of an aggravated drug robbery).

A.

To determine whether the evidence is sufficient to uphold McAllister's conviction of first-degree premeditated murder, we begin with the sufficiency of the evidence for aggravated robbery. We focus principally on the "intentionally aids" requirement, which is the emphasis of McAllister's argument on appeal.

The "intentionally aids" element of accomplice liability is a state-of-mind requirement. It is rare for the State to establish a defendant's state of mind through direct evidence. *See State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997). The "intentionally aids" requirement of accomplice liability is no different. A jury may infer the requisite state of mind for accomplice liability through circumstantial evidence, including the defendant's presence at the scene of the crime, a close association with the principal offender before and after the crime, a lack of objection or surprise under the circumstances, and flight from the scene of the crime with the principal offender. *State v. Hawes*, 801 N.W.2d 659, 668 (Minn. 2011).

In this case, the State relied solely on circumstantial evidence to prove McAllister's state of mind. When a challenge is to the sufficiency of the circumstantial evidence supporting a conviction, we apply the following two-step analysis:

> First, we must identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the

6

State. Second, we independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt. Thus, our review consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

*State v. Anderson*, 789 N.W.2d 227, 241–42 (Minn. 2010) (citations omitted) (internal quotation marks omitted). This case requires us to determine whether the circumstances proved by the State support a rational hypothesis that McAllister knew that Leondis and Fineday were going to commit an aggravated robbery and that he intended his presence or actions to further the commission of that crime.[2] If so, the evidence is sufficient only if the circumstances proved are inconsistent with any rational hypothesis other than guilt. *See State v. Batuoh*, 840 N.W.2d 804, 810-11 (Minn. 2013) (describing how to apply the circumstantial-evidence standard to an accomplice-liability case).

Under the first step of the circumstantial-evidence standard, we identify the circumstances proved by the State. The State's evidence established that McAllister,

---

[2]  A person commits first-degree aggravated robbery when, while committing a simple robbery, he or she "is armed with a dangerous weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or inflicts bodily harm upon another." Minn. Stat. § 609.245, subd. 1 (2014). The commission of a simple robbery, an element of an aggravated robbery, occurs when a person,

> having knowledge of not being entitled thereto, takes personal property from the person or in the presence of another and uses or threatens the imminent use of force against any person to overcome the person's resistance or powers of resistance to, or to compel acquiescence in, the taking or carrying away of the property . . . .

Minn. Stat. § 609.24 (2014).

7

Leondis, and Fineday accompanied McMillan into an alley on the night in question. While in the alley, the three men, acting together, each repeatedly punched and kicked McMillan. The assault lasted as long as 3 minutes and was particularly brutal. One eyewitness testified that he saw "three men beating the crap out of another man on the ground," and that the men were "taking full force soccer kicks towards his head." The witness told a 911 dispatcher that he did not know if McMillan would survive the assault, and recounted during his testimony that "it was one of the most horrific things [he'd] ever seen in [his] life." During the beating, the men stripped McMillan of his clothes until he was completely naked and then one of them placed some of McMillan's clothes in a nearby garbage can while the others continued to stomp on his head. Witnesses saw one of the men fire a gun toward McMillan before fleeing down the alley with some of McMillan's possessions. According to several of the witnesses, one of the men returned to the alley and shot McMillan again. Shortly after the second gunshot, police officers apprehended all three men approximately two blocks south of the alley. The officers discovered a number of items near the location where they arrested McAllister and Fineday, including a handgun in a nearby flowerbed, two cellphones, a set of keys, and an envelope and a piece of paper with McMillan's name on them.

The second step of the circumstantial-evidence standard requires us to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt. The circumstances proved give rise to a number of reasonable inferences regarding McAllister's mental state. As to McAllister's knowledge, even if he did not know that his nephews were going to beat and rob

8

McMillan when the men entered the alley, we can infer that he acquired such knowledge as the altercation progressed. *See Swanson*, 707 N.W.2d at 659 (stating that a defendant's presence at the scene of the crime can be used to infer the requisite state of mind for accomplice liability). The evidence presented at trial, particularly from the eyewitnesses, established that each of the men, including McAllister, fully participated in beating McMillan, and that none of them withdrew from the encounter once it started. Nor did any of them express surprise as the confrontation escalated. *See id.* (noting that a "lack of objection or surprise under the circumstances" can support an inference of accomplice liability). Indeed, witnesses described the beating as brutal and lasting several minutes, plenty of time for each man to understand fully the nature of the events unfolding before him.

In addition, the circumstances proved by the State support an inference that McAllister intended his actions to further the commission of the crime. All three men were full participants in the beating and the robbery, as each punched and kicked McMillan after they forced him to the ground, took part in stripping him of his clothing, and pilfered his possessions. One can also reasonably infer, based on the familial relationship and the unwillingness of McAllister to implicate either of his two nephews as the shooter, that McAllister had a "close association with [Leondis and Fineday] before and after the crime." *Id.* Accordingly, based on the circumstances proved by the State's evidence, it was reasonable for the jury to have concluded that McAllister both knew that Leondis and Fineday were going to commit a crime and intended his presence and actions to further the commission of that crime.

McAllister nevertheless argues that the circumstances proved also support a rational hypothesis consistent with his innocence—namely, that he did not know that one of his nephews had a gun and that he did not intend to assist either one of them in *shooting* McMillan. McAllister's argument, however, addresses the wrong question. At least at this stage of the analysis, the question is not whether he had the requisite state of mind to be an accomplice to a first-degree premeditated murder, but rather whether he was an accomplice to first-degree aggravated robbery. If he was an accomplice to aggravated robbery, then under Minn. Stat. § 609.05, subd. 2, he is also "liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by [him] as a probable consequence of committing . . . the crime intended." Under these facts, there is no rational hypothesis by which McAllister is innocent of the offense of first-degree aggravated robbery.

B.

Having addressed McAllister's arguments regarding his state of mind, we will now consider whether his complicity in the aggravated robbery renders him "liable" for the first-degree premeditated murder committed by one of his nephews. Minn. Stat. § 609.05, subd. 2. McAllister's liability for first-degree premeditated murder depends on whether there was sufficient evidence that one of his nephews committed the murder in

10

furtherance of the aggravated robbery, and whether it was reasonably foreseeable that the murder was a probable consequence of the aggravated robbery.[3] *See id.*

We begin with the first requirement, which is whether the State presented sufficient evidence that the murder was committed in furtherance of the aggravated robbery. When we have discussed the "in furtherance of" requirement, we have focused on the "common design" or "common purpose" of the participants. For example, in an early murder case, we stated that, even though only one of the assailants fired "the fatal shot," each of the accomplices had to "be held accountable" because the murder "was in furtherance of the original unlawful design" of the robbery. *State v. Barrett*, 40 Minn. 77, 80, 41 N.W. 463, 464 (1889).

The "common design" of the three men in this case was to beat and rob McMillan. It is clear from the evidence that all three men shared this common design because each fully participated in a brutal beating that itself could have led to McMillan's death. As to whether the murder was "in furtherance of" the intended crime, *Barrett* is instructive because, as in that case, the jury could have inferred that the men shot McMillan to

---

[3]    The district court gave an instruction based on Minn. Stat. § 609.05, subd. 2, when it told the jury that McAllister would be "guilty of any other crime the other person commits while trying to commit the intended crime, if that other crime was reasonably foreseeable to the defendant as a probable consequence of trying to commit the intended crime." We recognize that the district court's language was imprecise when it used the phrase "trying to commit the intended crime," rather than "in furtherance" of the intended crime, in describing the requirements of the statute. *See Swanson*, 707 N.W.2d at 659 (declaring that the relevant inquiry under Minn. Stat. § 609.05, subd. 2, is whether the crime committed was "in furtherance" of the intended crime). Nevertheless, McAllister has never argued, and does not argue now, that the district court's accomplice-liability instructions were erroneous.

11

overcome his resistance to the robbery. *See id.*; *State v. Pierson*, 530 N.W.2d 784, 789 (Minn. 1995) (holding that a shooting was "in furtherance of" a robbery when "the first shot was fired just after [the victim] stated 'get off me' and resisted the robbery effort"). In addition, killing McMillan furthered the commission of the robbery by facilitating the escape of the three men, preventing McMillan from later identifying his assailants, and preventing the possibility of retaliation from McMillan at some point in the future. *See State v. Russell*, 503 N.W.2d 110, 114 (Minn. 1993) (stating that eliminating the possibility of retaliation may be a reason for killing a victim in furtherance of a robbery); *State v. Merrill*, 428 N.W.2d 361, 369 (Minn. 1988) (listing the identification of the assailants and facilitation of escape as two reasons why a killing might be in furtherance of a robbery). Accordingly, we conclude that the only reasonable inference is that the murder was committed in furtherance of the robbery, and that there is no rational hypothesis consistent with the possibility that the murder was unconnected to the common design of the robbery.

We now turn to the second requirement, which is whether the State presented sufficient evidence that a murder was reasonably foreseeable as a probable consequence of the aggravated robbery. Based on the evidence presented, the jury could have inferred that a reasonably foreseeable and probable consequence of the brutal beating was that McMillan would die. As we have stated, the "reasonably foreseeable" standard is objective, even though the standard operates based only on what would be reasonably foreseeable to a person in the defendant's shoes. *See State v. Earl*, 702 N.W.2d 711, 721 (Minn. 2005). In other words, as applied here, reasonable foreseeability is about

12

"[w]hether the defendant could [have] reasonably foresee[n] that the victim would be murdered," *Pierson*, 530 N.W.2d at 789, not whether the defendant accurately predicted the murder. In making this determination, the jury may make reasonable inferences based on experience and common sense. *State v. Atkins*, 543 N.W.2d 642, 646 (Minn. 1996); *see also State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997) (explaining that a jury may infer that "a person intends the natural and probable consequences of his actions").

The circumstances proved by the State include the fact that multiple witnesses testified to the brutality of the beating, including one witness who said, "they were just beating him and beating him and beating him, and I just was like this guy's going to die, this guy's going to die." The jury could have used common sense to conclude, based collectively on the eyewitness statements, that it was reasonably foreseeable to McAllister that the three men would murder McMillan.

McAllister argues that the ultimate cause of death—here, death from an infection arising out of the shooting—was not reasonably foreseeable to him, even if it was reasonably foreseeable that McMillan could die from the injuries he sustained in the beating. Specifically, he claims that he is not guilty of first-degree premeditated murder because he had no idea that one of his nephews was carrying a gun and would use it during the confrontation.

We reject McAllister's argument for two reasons. First, there is no requirement in a murder case that an accomplice must accurately predict the cause of death of the victim. Indeed, such a requirement would be inconsistent with the text of Minn. Stat. § 609.05,

13

subd. 2, which turns on whether the "other crime" was "reasonably foreseeable by the person as a probable consequence of committing . . . the crime intended." *See Pierson*, 530 N.W.2d at 789 (holding that it is unnecessary "[u]nder Minnesota law . . . to have predicted with certainty that a companion would intentionally murder the victim"). Setting aside the state-of-mind requirements, the focus in a typical murder case is on whether the defendant's or an accomplice's acts caused a particular result—*i.e*., the death of the victim—and not on the particular method or instrumentality the perpetrator used to cause the death. *See generally* 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4, at 465-66 (2d ed. 2003) (stating that the actus reus for murder is the defendant's intentional conduct that causes "the fatal result"); 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.2, at 433-34 (2d ed. 2003) (describing the variety of means and methods of producing an intentional death that may constitute murder). Therefore, contrary to McAllister's argument, a person who has participated in a killing is not relieved of liability just because the reasonably foreseeable result occurred in an unexpected manner. *See, e.g.*, *State v. Bailey*, 732 N.W.2d 612, 615 (Minn. 2007) (upholding a conviction of first-degree murder while committing criminal sexual conduct when the cause of death was a heart attack suffered by the victim during a sexual assault).

Second, even if it were true that McAllister did not initially know that one of his nephews had a gun, the circumstances proved by the State include the fact that one of the three men fired at least one shot at McMillan before they fled from the alley. Thus, it was reasonable for the jury to have inferred, based on the circumstances proved, that McAllister knew that McMillan would die of a gunshot wound. *See Atkins*, 543 N.W.2d

14

at 647 (describing as "crucial" the fact that, even if one of the accomplices did not know the other was armed, he surely knew the principal was armed "from the moment [the first] shot was fired"). Consequently, it is immaterial, both legally and factually, that McAllister may not have known that one of his nephews was carrying a gun when the men first entered the alley.

Moreover, we reiterate that Minn. Stat. § 609.05, subd. 2, does not impose an independent state-of-mind requirement. Once the defendant's state of mind has been proven for the "intended crime" under Minn. Stat. § 609.05, subd. 1, the defendant is also "liable" for any other reasonably foreseeable crimes committed in pursuance of the intended crime under Minn. Stat. § 609.05, subd. 2. Thus, it is incorrect to say, as McAllister does, that he cannot be convicted of first-degree premeditated murder simply because he neither premeditated nor intended to kill McMillan. In fact, we specifically rejected this argument in *State v. Souvannarath*, in which the question was whether a district court had erred when it failed to instruct the jury that it had to find that the defendant "both premeditated and specifically intended the death of the victim" to find him guilty of first-degree premeditated murder as an accomplice. 545 N.W.2d 30, 33 (Minn. 1996); *see also State v. White*, 684 N.W.2d 500, 508 (Minn. 2004) (rejecting a similar argument as in *Souvannarath*). In answering that question in the negative, we observed that the defendant's argument was "fundamentally flawed" because the jury had to find only that the defendant had the state of mind necessary for accomplice liability,

15

not the state of mind associated with the offense of conviction.[4] *Souvannarath*, 545 N.W.2d at 33. Under *Souvannarath*, therefore, it is not necessary for an accomplice to have premeditated or intended a killing in order to be guilty of first-degree premeditated murder as an accomplice.

Accordingly, in light of the circumstances proved by the State and the application of Minn. Stat. § 609.05, subd. 2, the only rational hypothesis supported by the circumstances proved, viewed as a whole, is that McAllister is guilty of first-degree premeditated murder.

III.

The second question presented by this case is whether the district court erred when it denied McAllister's motion to suppress the portions of the interrogation that occurred after he told the officers: "[n]o, ain't no sense in talking no more man. You may as well cuff me up, book me, whatever. It's just that simple." The district court denied the motion to suppress because it concluded that McAllister's statement did not constitute an unequivocal invocation of his right to remain silent. *See State v. Munson*, 594 N.W.2d 128, 138-39 (Minn. 1999). We need not determine whether the district court's conclusion was correct, because any error in admitting those portions of the recordings

---

[4]     On a related note, McAllister does not argue that the nephew who shot McMillan lacked premeditation or the intent to kill—both of which were necessary to convict McAllister of first-degree premeditated murder on an accomplice-liability theory. *See State v. Young*, 710 N.W.2d 272, 278-79 (Minn. 2006) (stating that the evidence was sufficient to convict the defendant of first-degree felony murder because the *principal* had the intent to cause the death of the victim, and the defendant satisfied the state-of-mind requirements for accomplice liability in Minn. Stat. § 609.05, subd. 1).

16

that followed McAllister's alleged invocation of his right to remain silent was harmless beyond a reasonable doubt. *See State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997).

Although the presentation of a self-incriminating statement during trial is a powerful piece of evidence for the State, "a determination that the trial court erred in admitting the statement does not *per se* result in reversal of the conviction for a new trial." *State v. Robinson*, 427 N.W.2d 217, 224 (Minn. 1988); *see also United States v. Santos*, 235 F.3d 1105, 1108 (8th Cir. 2000) (affirming a conviction because any error in admitting two confessions was harmless beyond a reasonable doubt). Rather, the conviction may stand, notwithstanding a violation of the Fifth Amendment right to remain silent, "provided that the admission of the statement was harmless beyond a reasonable doubt." *Robinson*, 427 N.W.2d at 224.

In determining whether the presentation of allegedly inadmissible evidence was harmless beyond a reasonable doubt, we look to the record as a whole and ask, "[w]hat effect did the jury's hearing [the defendant's] statement . . . actually have on the guilty verdict rendered?" *Juarez*, 572 N.W.2d at 292. When the alleged error implicates a constitutional right, as here, the State bears the burden to prove the error was harmless beyond a reasonable doubt. *State v. Morrow*, 834 N.W.2d 715, 729 n.7 (Minn. 2013). The State satisfies its burden if it shows the verdict was "surely unattributable" to the error. *Juarez*, 572 N.W.2d at 292. "[O]verwhelming evidence of guilt is a factor, often a very important one," when determining whether an error was harmless beyond a reasonable doubt. *Id.* at 291. But we also consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing

17

argument, and whether it was effectively countered by the defendant." *State v. Al-Naseer*, 690 N.W.2d 744, 748 (Minn. 2005).

When Minneapolis police officers interviewed McAllister after the murder, he initially denied his involvement in the shooting. Even so, his answers that preceded the alleged invocation were incriminating because he implied that he participated in the beating. When referring to his involvement in the altercation, he stated, for example, "[y]ou can say assault if you want to" and that he was "accountable," just "not for the shooting." He also acknowledged that he was "going [away] for a long time." However, he repeatedly avoided identifying the shooter, responding at one point that it "ain't easy . . . . [t]o give up the person who had the gun."

After several hours, McAllister eventually decided to stop speaking with the officers, and made the statement by which he alleges he invoked his right to remain silent. The officers then escorted McAllister to see Leondis, and following that encounter, McAllister asked to speak with the officers again.[5] Once the interrogation resumed, McAllister was no longer evasive. He recounted a number of details about both the beating and the shooting, and identified Fineday as the shooter. He also stated that, although he did not see the gun earlier that evening, he had seen it before. He told the officers that, after the first shot, McMillan pleaded for help. He also drew a map of the

---

[5] The State moved to supplement the record on appeal with a video recording of the encounter between McAllister and Leondis that the district court viewed before it denied McAllister's pretrial motion to suppress the recordings of the interrogations. Because we hold that the admission of the recordings was harmless beyond a reasonable doubt and the supplemental recording is unnecessary to decide this appeal, we deny the State's motion.

18

scene and explained that, once the men fled from the alley, Fineday said, "[w]e gotta shut" McMillan up. According to McAllister, Fineday then pulled out a gun, which McAllister referred to as Fineday's "thudder." McAllister also recalled Fineday talking about how McMillan had soiled himself, which McAllister and his nephews found amusing. McAllister said that Fineday then shot McMillan again, and that Fineday told the men upon his return that McMillan "had [it] coming."

Two days later in a follow-up interview, McAllister changed his story. When the officers confronted McAllister with eyewitness accounts that suggested that Leondis was the shooter, McAllister said he "didn't see the whole thing," but acknowledged that the eyewitness accounts were not consistent with his previous statement that Fineday was the shooter. He maintained throughout the follow-up interview that he did not know who fired the first shot. McAllister also backtracked on the statements he made prior to the alleged invocation, stating that "[w]hoever told you I was standing right there [during the confrontation,] they told you a goddamn lie."

Based on the particular facts of this case, we conclude that any error in playing the portions of the recordings following his alleged invocation was harmless beyond a reasonable doubt. We acknowledge that playing the recordings to the jury was not helpful to McAllister, but we must also take into account that, even without the recordings, the State presented the jury with overwhelming evidence of McAllister's guilt, and that the *Al-Naseer* factors do not favor reversal. *See State v. Townsend*, 546 N.W.2d 292, 297 (Minn. 1996) ("We have a natural hesitation to reverse a conviction on errors . . . in the admission of evidence, where the evidence of guilt is strong . . . , [b]ut to

19

reach the conclusion[] that the errors were without prejudice we must hold that the guilt of defendant was conclusively proven." (alteration in original) (quoting *State v. Flowers*, 262 Minn. 164, 168, 114 N.W.2d 78, 81 (1962))).

We begin with the other evidence of McAllister's guilt. Four separate eyewitnesses, each of whom observed the entirety of the confrontation in the alley, described how the three men brutally beat McMillan while he was defenseless on the ground. Each described a prolonged and violent attack. In the words of one witness:

> I mean this was going on for an extended amount [of] time that they were just beating him and beating him and beating him, and I just was like this guy's going to die, this guy's going to die, he's laying on the ground in a fetal position moaning, crying, begging for help and I'm watching all of them just take turns one after the other kicking him as hard they can and I'm just like this guy is not going to live any longer.

As he watched the beating unfold, that same witness described to a 911 dispatcher how "there's like three guys kicking the guy in the head," and that he had doubts about whether the victim could live through the beating. Another witness recounted that McMillan was screaming and shouting for help as the three men hit him. Yet another witness told a 911 dispatcher that the three men were dragging McMillan and "stomping on his head" during the assault, while he was naked on the ground. Finally, one of the witnesses described the entire incident as "one of the most horrific things [he had] ever seen in [his] life." Thus, it is fair to say that, insofar as the details of the *beating* are concerned, much of what was in the recordings was cumulative of the other evidence the State presented at trial. *See State v. Bradford*, 618 N.W.2d 782, 794 (Minn. 2000)

(noting that the cumulative nature of the evidence is relevant to determining whether the erroneous admission of evidence was harmless beyond a reasonable doubt).

McAllister's primary complaint regarding the recorded statements seems to be that it undermined his credibility to the jury. It is certainly true that the statements, considered as a whole, portrayed McAllister as untrustworthy because he changed his story several times over the course of the interrogations. However, even the improper admission of recordings containing inconsistent statements by a defendant does not require reversal when the evidence is cumulative of other, properly admitted evidence bearing on a defendant's credibility. *See State v. McDonald-Richards*, 840 N.W.2d 9, 19 (Minn. 2013).

In this case, the jury had other evidence before it, all of which was admissible, that casted doubt on McAllister's credibility. For example, the police officer who arrested McAllister testified that, when he stopped McAllister, McAllister gave conflicting accounts about what he was doing and where he was going. McAllister also changed his story during the course of the first interrogation, even before he allegedly had invoked his right to remain silent. At first, McAllister denied even touching McMillan, but later indicated that he participated in the confrontation between McMillan and his nephews. Finally, McAllister's statements from the first interrogation—again, before he allegedly invoked his right to remain silent—were not credible in light of the testimony of Fineday and the four eyewitnesses. McAllister repeatedly stated that he "did nothing"—that is, he did not touch, kick, or beat McMillan, he did not know that anyone had taken anything from McMillan, and he could not identify the shooter because he "wasn't there" when the

shots were fired. However, Fineday and multiple eyewitnesses directly contradicted McAllister's statements by testifying that McAllister fully participated in the beating. Accordingly, to the extent that the disputed portions of the recordings reflected negatively on McAllister's credibility, those portions were cumulative of other evidence that had already given the jury a negative impression of McAllister's trustworthiness. *See McDonald-Richards*, 840 N.W.2d at 20 (concluding that a videotaped statement "was not particularly persuasive evidence with respect to [the defendant's] credibility because it was cumulative of other overwhelming evidence of her lack of truthfulness").

The remaining *Al-Naseer* factors also support the conclusion that the verdict was "surely unattributable" to the allegedly inadmissible recordings. *See Juarez*, 572 N.W.2d at 292. First, nothing about the presentation of the recordings suggests that the State used them in an inflammatory or highly prejudicial manner. In fact, the State played the recordings at the very end of its case-in-chief, only after it had presented the testimony of multiple eyewitnesses and Fineday. Thus, by the time the jury heard the statements, it had already heard much of the same evidence through other testimony. Of course, we must also take into account the fact that the jury would have heard some of the statements, including those in which McAllister was evasive, regardless of whether other statements were inadmissible.

Second, although the State referenced some of the allegedly inadmissible statements in its closing argument, most of the references related to whether McAllister had knowledge of the gun—an issue that McAllister disputed the entire time he was talking with the officers and that was largely cumulative of the overwhelming evidence

22

that he was a full participant in the beating. In other words, the overwhelming evidence regarding the brutality of the beating and the serious injuries suffered by McMillan made the dispute about the gun largely immaterial to the disputed question of whether death was a "reasonably foreseeable" consequence of the three men's actions. Indeed, the jury did not need to speculate about whether death was a reasonably foreseeable consequence of the men's actions because one of the witnesses told them that, based on his own observations about the beating, McMillan was "not going to live any longer."

Third, although defense counsel was not able to effectively counter all of the evidence presented through the allegedly inadmissible portions of the recordings, he was able to counter some of it, including the evidence about the gun. Defense counsel repeatedly highlighted, for example, that there was no evidence tying McAllister to the gun and that the State had failed to prove that the gun was the murder weapon because the results from ballistic testing were inconclusive.

In sum, after reviewing the trial record, we conclude that, even if the district court erred when it failed to suppress portions of McAllister's recorded statements, any error was harmless beyond a reasonable doubt because the verdict was surely unattributable to the error.

IV.

For the foregoing reasons, we affirm McAllister's conviction of first-degree premeditated murder.

Affirmed.

23