STATE OF MINNESOTA

IN SUPREME COURT

A15-0483

Stearns County                                                     Gildea, C.J.
                                                   Took no part, Chutich, J.

State of Minnesota,

                        Respondent,

vs.                                                      Filed:  May 25, 2016
                                            Office of Appellate Courts

Marcus Michael Barshaw,

                        Appellant.

_____

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, Saint Paul, Minnesota; and

Janelle Kendall, Stearns County Attorney, Saint Cloud, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Richard Schmitz, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Because the evidence of premeditation was sufficient, the district court did not err in convicting appellant of first-degree premeditated murder.

2.      Because the evidence of appellant's intent to cause a peace officer to fear immediate bodily harm was sufficient, the district court did not err in convicting appellant of first-degree assault of a peace officer.

Affirmed.

1

O P I N I O N

GILDEA, Chief Justice.

Following a bench trial, the Stearns County District Court found appellant Marcus Michael Barshaw guilty of first-degree premeditated murder in connection with the shooting death of Jeffery Schutz and first-degree assault of a peace officer in connection with an assault committed against Deputy Chad Meemken.[1]  The court sentenced Barshaw to life in prison without the possibility of release.[2]  On appeal, Barshaw argues that the evidence presented at trial was insufficient to support his convictions of premeditated murder and first-degree assault of a peace officer.  Because the evidence was sufficient to support both convictions, we affirm.

The evidence at trial established that Barshaw shot and killed Jeffery Schutz near his home in Rockville on October 21, 2012.  Barshaw first met Jeff and his wife, Mandy,[3] in June 2012 when Barshaw was in Rockville to purchase a car from his friend.  Because the car needed significant repair, Barshaw stayed in Rockville for a month while his friend and Jeff worked on the car.  During the day, Barshaw would spend time with

---

[1]     In addition to the offenses of premeditated murder and first-degree assault, the court also found Barshaw guilty of the lesser-included offense of second-degree intentional murder of Jeffery Schutz and the second-degree assault of a resident of the apartment building where Barshaw hid after he shot Schutz.  Because Barshaw does not challenge the court's verdicts on the second-degree murder and second-degree assault offenses, we do not discuss those offenses.

[2]     The court also imposed a consecutive 120-month sentence for the conviction of first-degree assault of a peace officer.

[3]     Because Jeff and Mandy share the same last name, we refer to them by their first names for clarity.

Mandy, drinking alcohol, using marijuana, and listening to music. Their relationship eventually became sexual. After Barshaw left Rockville, Mandy visited Barshaw at his home in Walker on a number of occasions between July and October of 2012.

On the night of October 20, Barshaw, who was upset and intoxicated, called Mandy and told her that he needed help. Mandy agreed to make the 2-hour drive to Walker and bring Barshaw back to Rockville. Mandy arrived at Barshaw's apartment in Walker around midnight, and Barshaw came out of his building and asked her to open the trunk. Without telling Mandy what he was doing, Barshaw placed an SKS semi-automatic assault rifle and a Kel Tec .380 semi-automatic pistol in the trunk.

Mandy and Barshaw arrived at the Schutzes' house in Rockville around 2:30 a.m. Barshaw waited in the car while Mandy went into the house to speak with Jeff. Jeff told Mandy he was not willing to let Barshaw stay at their house. Before she left the house, Mandy retrieved a jar of marijuana, a pipe, and a bottle of brandy. As she left, she noticed that Barshaw was standing in the yard holding his SKS assault rifle.[4] Mandy and Barshaw then went into a motor home parked 15-20 feet behind the Schutzes' house. Barshaw placed his rifle in the bedroom at the back of the motor home, and he and Mandy smoked marijuana.

While Mandy and Barshaw were in the motor home, Jeff's cousin, Anthony Konz, arrived at the Schutzes' house. Jeff and Konz approached the motor home, suspecting

---

[4] The record indicates that Barshaw typically wore the handgun in a hip holster, but the record does not establish whether Barshaw had the handgun in his possession at this point.

3

that Mandy and Barshaw were inside. When he found the motor home locked from the inside, Jeff pounded on the door. Mandy soon appeared in the passenger seat and slid the window open while Barshaw remained in the back of the motor home. Mandy and Jeff argued but eventually calmed down and shared a cigarette. At no time during the conversation did Jeff threaten Mandy or Barshaw, nor did he become violent.

At some point during Mandy and Jeff's conversation, Barshaw began yelling. He came toward the front of the motor home, holding his rifle to his chest, and stood behind Mandy in the window. Barshaw kicked or hit the side of the motor home, denied having a sexual relationship with Mandy, and shouted to Jeff that he just wanted to be friends. In response, Jeff threw his beer bottle at the motor home. At this point Mandy told Jeff to "settle down" because Barshaw had guns. When he learned that Barshaw was armed, Jeff asked Konz to call 911.

Mandy then left the motor home and slammed the door shut in an effort to keep Barshaw inside. As Mandy attempted to persuade Jeff to go inside the house, Barshaw and Jeff continued to shout at each other. And then Barshaw "came barreling out" of the motor home with the rifle in his hands. Jeff reacted by moving toward the front of the motor home, away from Barshaw.

At this point, Barshaw began what would be an almost 100-foot pursuit of Jeff. As Jeff backed away from Barshaw, Jeff said, "I don't want that [gun] here." He also told Barshaw to "get away." Undeterred by Jeff's statements, Barshaw continued to follow Jeff as Jeff retreated down the side of the motor home toward the alley behind the Schutzes' property.

4

Konz, who was still on the phone with the 911 operator, heard Jeff tell Barshaw to "[g]et off of [him]." He also heard Mandy yelling, "Stop! Stop!" and "knock it off." Konz then saw Jeff emerge from behind the motor home and run across the alley toward a light pole in a neighbor's yard, "like he was running to get away." Jeff stopped near the light pole, using it for cover, and told Barshaw, "Don't point a gun at somebody unless you intend on using it." Konz then saw Barshaw close the distance between himself and Jeff by running into the alley. After Mandy screamed, "No, no, no," Barshaw pointed the rifle at Jeff and repeatedly pulled the trigger. Three of the bullets struck Jeff in a tight pattern puncturing his lungs and aorta. As Jeff twisted and fell toward the ground, Barshaw fired a second burst of shots. Approximately 50 seconds passed between the time Jeff told Barshaw to "get away" and when Barshaw fired the first of the nine shots.

Konz described the shooting as "[t]hree shots fired," followed by "a break," and then "a few more shots." The Schutzes' neighbor also heard the shots and stated, "It was just like a bam, bam, and then there was a pause, and then bam, bam, bam, bam." Another witness, who was out on an early-morning walk, described the pattern of shots: "They were very fast. My guess is [there were] at least six, seven. . . . There was a real fast volley, a slight pause, and then probably another three, four."

It is undisputed that nine shots were fired at Jeff, six or seven of which struck his body. The medical examiner testified that at least two of the gunshot wounds were "equally fatal"—one penetrating both the right and left lung and striking the vertebral column and another striking the aorta and passing through the abdominal organs and diaphragm before exiting the body. Two shots were fired while Jeff was falling or lying

5

on the ground. A forensic analysis of the murder weapon determined that Barshaw would have had to have pulled the rifle's trigger nine separate times to fire the nine shots.

After the shooting, Barshaw fled with the rifle and his handgun. Stearns and Benton County police officers searched the surrounding area from approximately 4:30 a.m. to 8:00 a.m. that morning. When the officers reconvened at police vehicles parked in the area, the group was approached by a resident who lived in an apartment building across from the Schutzes' residence. The resident informed the officers that there was a man with guns in the downstairs laundry room of the apartment building. Barshaw's friend, with whom Barshaw had stayed the previous summer, also lived in the apartment building.

While the apartment resident spoke with the police, another resident entered the downstairs laundry room and found Barshaw hiding behind a water heater with his handgun under his chin. Barshaw told the resident that he had "d[one] something wrong" and was "going to kill [him]self." The resident told Barshaw that there were a "bunch of people outside" and asked Barshaw to give him the handgun. Barshaw refused, and as the resident turned to leave the laundry room, Barshaw stood up and pointed his rifle at the resident. Barshaw denied threatening the resident with the rifle, but testified that he did point his handgun at the resident "to scare him."

By the time Barshaw left the downstairs laundry room, the police were congregated around both the east and west entrances to the apartment building. At all times, the officers were wearing black tactical vests with the word "SHERIFF" across the front and back, in bold white letters.

At the front of the building, Sergeant Soyka and two others crouched outside the east doorway with a view of the downstairs hallway and entrance to the laundry room. As Barshaw stepped out of the laundry room, holding the rifle across his chest, he glanced to the right toward Soyka. Soyka identified himself as a police officer and repeatedly ordered Barshaw to drop his gun. After making eye contact with Soyka, Barshaw turned away from Soyka and headed toward the staircase that led to the west doorway. As Barshaw began to climb the stairs to the back door, Soyka shouted at the officers at the rear of the building, "He's coming out the west door!"

Sergeant Dingmann and Deputies Meemken and Heinen were positioned at the west entrance of the apartment building. Deputy Heinen and Sergeant Dingmann took cover behind a pick-up truck parked to the side of the building, while Deputy Meemken stood by the corner of the building with a direct view of the west doorway, which was part of a small vestibule. As Barshaw climbed the vestibule stairs, he was visible in the window of the west door, and Deputy Heinen and Sergeant Dingmann repeatedly shouted, "Show us your hands!" Barshaw did not comply and instead continued up the stairs and opened the back door "about 45 degrees." When Barshaw's body was partially out of the doorway, Deputy Meemken saw that Barshaw's left hand held a small, black handgun. Barshaw later admitted that he saw Deputy Meemken standing at the corner of the building in full tactical gear. When Barshaw raised the handgun to the 4 or 5 o'clock position in the direction of Deputy Meemken, the deputy discharged his rifle at Barshaw. When asked why he shot Barshaw, Deputy Meemken testified, "I had to stop him. . . . If

7

I didn't, my life, my partner's life, and the lives of other citizens were at risk of being seriously injured or killed."

Barshaw fell forward out of the doorway, dropping the handgun and the rifle. Sergeant Dingmann saw the handgun in Barshaw's hand as he fell forward. After Barshaw fell, Sergeant Dingmann pulled him away from the guns, tossed the holster he found at Barshaw's hip, and administered first aid. Barshaw was taken to the hospital where he told a nurse that he had been shot by the police "[c]ause [he] had a gun in [his] hand." Police examined the handgun after Barshaw was apprehended and confirmed that the gun was loaded with a bullet in the chamber.

Barshaw waived his right to a jury trial and the matter proceeded to trial before the court. At trial, the State presented eyewitness testimony from both Mandy and Konz identifying Barshaw as the person who shot and killed Jeff. The State also produced eyewitness and forensic evidence to support the State's theory that Barshaw premeditated Jeff's murder from the time Barshaw left the motor home with his rifle to the time he fired the shots. As to the first-degree assault charge, the State offered testimony from Deputy Meemken, as well as a number of other officers present at the scene of Barshaw's arrest.

For his part, Barshaw asserted both an intoxication and an alternative perpetrator defense to the first-degree premeditated murder charge.[5] In the alternative, the defense asked that if the judge found that Barshaw pulled the trigger of the murder weapon, he

---

[5]     The alleged alternative perpetrator was Jeff's wife, Mandy.

8

also find that Barshaw did so without premeditation or intent, but instead as a snap response.

The district court found Barshaw guilty of first-degree premeditated murder and the other counts and rejected Barshaw's intoxication and alternative perpetrator defenses, as well as the argument that he pulled the trigger as a snap response. As to premeditation, the court found that Barshaw

> prepared for the potential use of his firearms by removing them from the trunk . . . and taking them into the motor home. If the rifle was not loaded and ready to fire when he took it into the motor home, it certainly was by the time he burst out of the motor home with the murder weapon in hand. Defendant still had a few minutes to consider what he was doing. He menaced Jeffery Schutz with his weapon and deliberately followed him a distance of some 80 to 100 feet around the motor home to the area of the utility pole before taking aim and firing repeatedly at Jeffery Schutz.

As to the first-degree assault of a peace officer charge, the court found that "[b]y failing to comply with multiple law enforcement commands to disarm and surrender," and "by continuing to approach Deputy Meemken with a weapon and by opening the back door while holding the handgun in a threatening position, Defendant acted with intent to cause Deputy Meemken fear of immediate bodily harm or death by the attempted use of deadly force."

After entering judgments of conviction on the first-degree premeditated murder and first-degree assault of a peace officer offenses, the district court sentenced Barshaw to life imprisonment without the possibility of release. This direct appeal follows.

I.

We turn first to Barshaw's argument that the evidence presented at trial was insufficient to support the district court's determination that he premeditated Jeff's murder. When an appellant challenges the sufficiency of the evidence presented at trial, we undertake a "painstaking review of the record," *State v. Flowers*, 788 N.W.2d 120, 133 (Minn. 2010) (quoting *State v. Brown*, 732 N.W.2d 625, 628 (Minn. 2007)), and review the evidence "to determine whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a [fact-finder] could reasonably conclude that the defendant was guilty of the offense charged." *State v. Fairbanks*, 842 N.W.2d 297, 306-07 (Minn. 2014) (quoting *State v. McArthur*, 730 N.W.2d 44, 49 (Minn. 2007)). We use the same standard of review in both bench and jury trials in evaluating the sufficiency of the evidence, *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011), "view[ing] the evidence presented in the light most favorable to the verdict, and assum[ing] that the fact-finder disbelieved any evidence that conflicted with the verdict." *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015).

The parties agree that we should apply the standard of review that governs when the State proves the crime through circumstantial evidence. Under that standard, we review the sufficiency of the evidence using a two-step analysis. *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015). We first identify the circumstances proved, deferring to the fact-finder's "acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 53-54 (quoting *State v. Anderson*, 789 N.W.2d 227, 241-42 (Minn. 2010)). Even in

cases involving circumstantial evidence, the factfinder is "generally 'in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony.' " *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011) (quoting *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). After identifying the circumstances proved, we "independently examine the reasonableness of all inferences that might be drawn from the circumstances proved . . . [to] determin[e] whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Anderson*, 789 N.W.2d at 241-42. Applying that standard here, we conclude that the evidence of premeditation is sufficient to support Barshaw's conviction of first-degree murder.

A person commits first-degree premeditated murder when he or she "causes the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1) (2014). A killing is premeditated when one considers, plans or prepares for, or is determined to commit the killing prior to its commission. Minn. Stat. § 609.18 (2014). A finding of premeditation requires that the defendant had "some appreciable time," after forming the intent to kill, "to 'consider, plan or prepare for, or determine to commit' the killing." *Palmer*, 803 N.W.2d at 734 (quoting Minn. Stat. § 609.18; *State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992)).

We have recognized, when assessing the sufficiency of evidence of premeditation, that premeditation is a state of mind " 'generally proven through circumstantial evidence,' and 'often inferred from the totality of circumstances surrounding the killing.' " *Fox*, 868 N.W.2d at 224 (quoting *State v. Hughes*,

11

749 N.W.2d 307, 312 (Minn. 2008)). Our precedent also discusses three categories of evidence relevant to determining the sufficiency of premeditation evidence: planning activity, motive, and the nature of the killing. *Anderson*, 789 N.W.2d at 242. In this case, the district court did not make findings on a motive for the murder and so we will focus on evidence of planning activity and the nature of the killing. The evidence of planning activity that occurred after the appellant arrived in Rockville, along with evidence as to the nature of the killing itself, lead to a reasonable inference consistent with guilt.

Planning activity pertains to "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *Fox*, 868 N.W.2d at 224 (quoting *Hughes*, 749 N.W.2d at 313). In *Palmer*, we found evidence of planning activity where the defendant took possession of the murder weapon prior to the killing. 803 N.W.2d at 734; *see also State v. Moore*, 846 N.W.2d 83, 89 (Minn. 2014) (characterizing the defendant's retrieval of the murder weapon from one room and bringing it to another as planning activity); *State v. Goodloe*, 718 N.W.2d 413, 419 (Minn. 2006) (holding that there was sufficient evidence of premeditation where the defendant arrived at the murder scene with a loaded gun, "procured the gun from under the driver's seat upon leaving the vehicle, and approached [the victim] with the gun extended in front of him"). We have also held that the decision to chase a victim is circumstantial evidence of planning activity that supports an inference of premeditation. *State v. Ortega*, 813 N.W.2d 86, 100-01 (Minn. 2012); *cf. State v. Holliday*, 745 N.W.2d 556, 560, 563-64 (Minn. 2008) (characterizing the fact that the defendant "ran [] across

the [] street . . . holding the revolver directly in front of him . . . [and] aim[ed] at a specific person" as nature-of-the-killing evidence of premeditation).

Here, the circumstances proved as to planning activity are consistent with an inference of guilt. Barshaw brought two weapons, a rifle and a handgun, to the murder scene. He moved the rifle from the back of Mandy's car into the motor home, placing it in a more accessible location. And then, while Mandy and Jeff were arguing and talking at the front of the motor home, Barshaw brought the rifle from the back of the motor home to the front passenger side window. He also took the rifle with him as he "came barreling out" of the motor home.

Barshaw then pursued Jeff for roughly 50 seconds, chasing Jeff over a distance of 80 to 100 feet. During the pursuit, Mandy and Jeff both pleaded with Barshaw to stop the attack. Specifically, after Jeff stopped and attempted to use a light pole for cover, he told Barshaw, "Don't point a gun at somebody unless you intend on using it." Barshaw then closed the distance between himself and Jeff by running into the alley. As Mandy screamed, "No, no, no," Barshaw aimed the rifle at Jeff and repeatedly pulled the trigger. Barshaw's decision to arm himself and pursue his victim is important planning evidence that supports the inference of premeditation. *See Goodloe*, 718 N.W.2d at 419 ("The time between [the defendant's] arrival at the store and the shooting, during which [the defendant] pursued [the victim] with a loaded gun, constitutes an appreciable period of

13

consideration and preparation for the killing, justifying the jury's finding of premeditation.").[6]

Evidence as to the nature of Jeff's killing also supports the inference of premeditation. Nature of the killing evidence relates to "the defendant's actions before, during, and after the killing." *Anderson*, 789 N.W.2d at 242. Such evidence includes the number of times the defendant used the murder weapon and the number of wounds inflicted, *State v. Moua*, 678 N.W.2d 29, 41 (Minn. 2004); the infliction of wounds to vital areas of the body, *Holliday*, 745 N.W.2d at 563; and the amount of time between the infliction of the wounds, *McArthur*, 730 N.W.2d at 50. Evidence that the shooter took careful aim at the victim also supports a finding of premeditation. *Anderson*, 789 N.W.2d at 242. Finally, the defendant's concern with escaping rather than assisting the victim suggests premeditation rather than an impulse killing. *McArthur*, 730 N.W.2d at 50.

The circumstances proved as to the nature of the killing are consistent with an inference of guilt. Barshaw fired nine shots, shooting around the lightpole that Jeff used for cover, and six or seven of the shots struck Jeff's body. The first two bullets that struck Jeff hit vital areas of his body, puncturing his lungs and aorta. As Jeff twisted and fell toward the ground, Barshaw fired a second burst of shots. Two bullets struck Jeff

---

[6] The district court found that "[t]he seeds of premeditation were present while [Barshaw] was still in Walker," where, prior to Mandy's arrival the evening before the murder, Barshaw created a series of Facebook posts expressing thoughts about dying in a shootout. That Barshaw premeditated the murder before arriving in Rockville, however, was not the State's theory at trial. Indeed, the State conceded that Barshaw formed the intent to kill Jeffery Schutz either immediately before or after Barshaw left the motor home with his assault rifle. We therefore do not address the Facebook posts as evidence of premeditation.

while he was in a falling or prone position. Additionally, three witnesses testified that Barshaw paused between the first and second volley of shots before fleeing the scene. *See State v. Tomassoni*, 778 N.W.2d 327, 333-34 (Minn. 2010) (stating that "a short amount of time elapsed between" gunshots was evidence of premeditation). All of this evidence as to the nature of the killing supports the inference that Barshaw premeditated the murder.

Based on our review of the evidence of planning activity and the evidence as to the nature of the killing, we conclude that the circumstances proved support a reasonable inference that Barshaw premeditated the murder. But this conclusion does not end our inquiry under the circumstantial-evidence test. We must next consider whether the circumstances proved also support a rational inference other than guilt.

Barshaw argues that the circumstances proved support a rational inference inconsistent with guilt—namely that he intentionally killed Jeff but did so only as a "snap response" to Jeff's statement, "Don't point a gun at somebody unless you intend on using it." Based on the circumstances proved in this case, such an inference simply is not reasonable.

Barshaw's alternative hypothesis might be reasonable if Barshaw had fired the rifle immediately in reaction to what Barshaw describes as a dare. But Barshaw did not immediately start shooting after Jeff made the comment. Instead, Barshaw continued running into the alley, closing the distance between himself and Jeff. He then stopped his pursuit and pointed his rifle at Jeff as Jeff tried to hide behind the light pole and as Mandy screamed, "No, no, no." Barshaw then pulled the rifle's trigger nine separate

times in two distinct bursts of gunfire. Barshaw did not stop firing the rifle after the first volley of shots, but instead fired an additional set of shots after a brief pause. And the shooting itself occurred only after Barshaw had chased Jeff for nearly a minute with a loaded rifle, despite pleas to "get away" and "stop it." In short, Barshaw's argument that the circumstances proved support the conclusion that Barshaw's decision to shoot Jeff nine times was merely a "snap response" to a dare during an ongoing dispute is not reasonable on this record.

Having reviewed the totality of the circumstances proved, we conclude that the only reasonable inference from those circumstances is that Barshaw premeditated the murder. We therefore hold that the evidence in this case was sufficient to support Barshaw's conviction of first-degree premeditated murder.

II.

Barshaw also argues that the evidence is insufficient to support his conviction of first-degree assault of a peace officer. Minnesota Statutes § 609.221, subd. 2(a) (2014), states that "[w]hoever assaults a peace officer . . . by using or attempting to use deadly force against the officer . . . while the person is engaged in the performance of a duty imposed by law" commits assault in the first degree. For purposes of Minn. Stat. § 609.221, subd. 2(a), assault includes "an act done with intent to cause fear in another of immediate bodily harm or death." Minn. Stat. § 609.02, subd. 10 (2014). Barshaw makes two arguments challenging this conviction. First, he contends that the district court's finding that Barshaw lifted his handgun at Deputy Meemken as he left the apartment building was clearly erroneous. Second, Barshaw argues that even if he did lift

16

the handgun in Deputy Meemken's direction, he did not intend to cause Deputy Meemken to fear immediate bodily harm. We consider each argument in turn.

A.

We first consider Barshaw's threshold argument that the district court's finding that he lifted his handgun toward Deputy Meemken was clearly erroneous. A finding of fact is not clearly erroneous if it is reasonably supported by the evidence as a whole. *State v. Diede*, 795 N.W.2d 836, 854 (Minn. 2011). In determining whether the evidence is sufficient, we defer to the fact-finder's credibility determinations and "assume that the fact-finder disbelieved any evidence that conflicted with the verdict." *Fox*, 868 N.W.2d at 223.

The district court's finding that Barshaw lifted the handgun toward Deputy Meemken is not clearly erroneous because it is reasonably supported by the record. Specifically, Deputy Meemken testified that Barshaw raised his gun to a 4 or 5 o'clock position in Meemken's direction, and the court found this testimony credible. Deferring to the court's determination of witness credibility, the evidence supports the court's finding that Barshaw lifted his handgun at Deputy Meemken.

In support of his argument that this finding is clearly erroneous, Barshaw relies on the testimony of Deputy Heinen and Sergeant Dingmann, who said that they did not see the handgun in Barshaw's left hand before Barshaw was shot by Deputy Meemken. Deputy Heinen and Sergeant Dingmann, however, were not in the same position as Deputy Meemken to see Barshaw's hand as he was coming out. Moreover, to the extent their testimony is read to support the conclusion that Barshaw did not have a gun, such

17

testimony is inconsistent with the verdict, and therefore we do not consider it when assessing the sufficiency of the evidence. *See State v. Chavarria-Cruz*, 839 N.W.2d 515, 519 (Minn. 2013) (noting the evidence must be construed in the light most favorable to the verdict, "disbeliev[ing] any testimony conflicting with that verdict" (quoting *Holliday*, 745 N.W.2d at 562)).

Barshaw also relies on the fact that he suffered injuries to his right upper back and right side of his chest to suggest that the finding that he lifted his gun toward Meemken is clearly erroneous. No expert testimony was presented as to Barshaw's injuries, but based upon the eyewitness testimony provided, the district court found that the injuries "are not inconsistent with Deputy Meemken's observation of a handgun in Defendant's left hand pointing out the doorway." Deferring to the district court's credibility determinations and assuming that the court disbelieved any evidence that conflicted with its verdict, we conclude that the court's finding that Barshaw lifted the handgun toward Deputy Meemken is not clearly erroneous.

B.

We next consider Barshaw's argument that, even if he did lift his handgun at Deputy Meemken, the evidence was insufficient to support a finding that he intended to cause Meemken fear of immediate bodily harm. Intent can be inferred from the totality of the circumstances proved, including the defendant's conduct, the nature of the assault, and the events leading up to and immediately following the crime. *Davis v. State*, 595 N.W.2d 520, 525-26 (Minn. 1999). Because the State's evidence of intent was wholly circumstantial, we apply the two-step circumstantial-evidence test described

18

above to determine whether the inferences drawn from the circumstances proved are consistent with a finding of guilt and inconsistent with a finding of innocence.

The circumstances proved show that Barshaw used one of his firearms in a threatening way to facilitate his escape. Specifically, a few minutes before his encounter with Deputy Meemken, Barshaw pointed one of his weapons at an apartment resident in order "to scare him." Although Barshaw had the holster for his handgun when he confronted the resident, Barshaw chose not to re-holster his handgun before leaving the laundry room because he did not know if he was going to face further "problems" from the resident. Barshaw's use of a weapon to scare the apartment resident supports the inference that Barshaw intended to cause fear in those he threatened.

After Barshaw threatened the resident, he continued his effort to evade capture. As Barshaw moved out of the apartment laundry room, he made eye contact with Sergeant Soyka, who identified himself as a police officer and repeatedly ordered Barshaw to drop his gun. Barshaw ignored Soyka's commands, turned away from Soyka, and headed toward the staircase that led to the west doorway.

As Barshaw climbed the vestibule stairs, he was visible in the window of the west door, and Deputy Heinen and Sergeant Dingmann repeatedly shouted, "Show us your hands!" Ignoring their commands, Barshaw continued up the stairs and opened the back door "about 45 degrees." Barshaw then raised his handgun to a 4 or 5 o'clock position in Meemken's direction. Fearing for his life, Meemken shot Barshaw. There is no dispute that Meemken feared that Barshaw was going to shoot his way out of the apartment building. *See State v. Ott*, 291 Minn. 72, 75, 189 N.W.2d 377, 379 (1971) (stating that

19

while the intent of the actor is the "focal point" for the intent inquiry, the "ordinary effect upon others of the acts alleged to constitute the crime may naturally be taken into account to determine intent").

Finally, the events leading up to the assault support an inference that Barshaw intended to cause fear of bodily harm. Specifically, Barshaw had committed a murder less than 5 hours before the encounter with law enforcement, tried to hide, made no indication he would surrender, and attempted to leave the building with two firearms, at least one of which was loaded, even though he knew the building was surrounded by law enforcement.

Considering all of the circumstances proved, we conclude that it is reasonable to infer that Barshaw intended to cause Deputy Meemken to fear that Barshaw, who was attempting to escape capture for the murder, was going to shoot his way out of the apartment building and inflict bodily harm on those Barshaw encountered on the way out.

But, according to Barshaw, the circumstances proved are also consistent with a rational hypothesis other than guilt. That hypothesis, according to Barshaw, is that he merely raised the handgun in an effort to open the door so that he could get outside, but not with the intent to cause fear of immediate bodily harm. That hypothesis is unreasonable.

Barshaw's hypothesis is unreasonable because he used his weapon to "scare" one of the people he confronted as he was evading capture, and he ignored repeated commands by law enforcement to drop his weapons. If, as Barshaw argues, he raised the handgun simply in an effort to open the door, he would have dropped his weapons in

20

response to police directives. Rather than heeding the warnings from law enforcement, however, Barshaw chose to raise a loaded handgun to a 4 or 5 o'clock position when he saw Deputy Meemken standing at the corner of the building clad in tactical gear emblazoned with the word "SHERIFF." Barshaw did so, according to the circumstances proved, in order to evade capture following the commission of a murder.

In sum, the circumstances proved are inconsistent with any rational hypothesis other than that Barshaw raised a loaded handgun toward Deputy Meemken with the intent to cause Deputy Meemken to fear that Barshaw was going to shoot at him. We therefore hold that the evidence was sufficient to support Barshaw's conviction of first-degree assault of a peace officer.

Affirmed.


CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.